75 U.S. 362
 19 L.Ed. 461
 8 Wall. 362
 KEMPNER
v.
CHURCHILL.
 December Term, 1869
 
 APPEAL from the Circuit Court for the District of Northern Illinois, in which court, Churchill and others, merchants of New York, and judgment creditors of one Levison, filed a bill against a certain Kempner (Levison being impleaded), to set aside a purchase of a whole stock of dry goods which the bill alleged that Kempner, confederating and colluding with Levison how to cheat the complainant, and to hinder, delay, and defraud the creditors of Levison, had proposed to purchase, and had purchased of Levison, for a greatly inadequate consideration, to wit: for fifty-five cents on the dollar.
 It appeared, from the testimony, that Levison, who kept a clothing store in Chicago, and had, at the time, a stock of clothes there, worth $6000, went on, about the middle of March, 1866, to New York, where, according to the testimony, he enjoyed the reputation of 'a responsible, paying, first-class customer,' and there laid in an additional quantity, which he purchased on credit, and which cost him $11,622 more. The new goods were forwarded to Chicago; and the whole stock thus cost $17,622. The circumstances attending the sale were thus testified to by Levison:
 'The sale was made on the 8th of April, 1866. I came back from New York about the 22d of March, 1866. I was in Chicago some few days; Mr. Kempner came in the store one day, shook hands, and said he had an idea of going to Omaha to open business and, if he could buy a cheap stock of goods, he would take them up there; that was no Saturday, a week before the sale. I told him I had a pretty good stock of goods here that I would sell him, as I had a chance to go into something that would pay me better than this business just now. He said he would see, and come in to-morrow with his brother-in-law, and look over the goods, as he was a better judge of goods and prices than he was. On the following day, he came in with David Adams, and they did look over the stock, and he said would go home and think about it, and come in to-morrow and see me. The next day, he came in and offered me fifty-five cents on the dollar. I got pretty mad at that, and told him seventy cents would not buy them, and went off and left him. A day or two afterwards, he came in again, and we had a talk, and he said the goods were not worth more than that to him, and the had taken advice with some friends, who told him that goods were not worth as much then as they were at the time I bought them, and my credit was not very good in New York, so I had to pay ten or fifteen per cent. more than any one else. He said he wanted to make something on them; he would have to sell them on credit, and wait for his money. I told him it was no such thing, that I did not pay more than any one else; that he might go around town and inquire, and make himself familiar with the prices, and he could find out. I told him it did not make any difference, that that money would not buy them, and I expected to hear from another gentleman in the country, who wanted to go into business in Chicago, and I would, probably, sell out to him; that ended the conversation that day. The next day, I think it was, I met Mr. Kempner and asked him why he circulated the reports around that he had offered me fifty-five cents, and that I was going to sell out. He said he did not circulate any reports, but he would take me in and show me a good honest man, who would tell me where those reports came from. I went in with him to David Witowsky's fur store, on Lake Street; Witowsky said he had heard reports, but could not tell where they came from. We three stood and talked about the value of the goods. I went out after a while and went home to the store. In the afternoon, Mr. Kempner was passing by, and I called him in. We had some talk there about business. He said to me, 'There is some pretty rough talk in town about you; you had better not delay this matter; you had better let me have the goods, and put the money in your pocket, and let the creditors go to the devil,' or words to that effect. I told him I would not sell them for that price anyway. He said, 'That is my offer, and, if you can do any better, do it.' I told him I did not see what I had to fear from the creditors; that I did not owe any one anything that was due, except Freidlander, Steitch & Co. He said, 'You had better look out for them, I know them better than you do.' On Saturday, we came together again, in the store, the 7th of April, 1866. I told him, I wanted to close the trade with him. I asked him to meet me half way in the offer. I had offered them to him before for sixty-five cents; either at this time or before he had offered me fifty-five cents. He said, 'No; he would not give any more than fifty-five cents.' Previous to that, I told him I would sell him the fixtures in the store. He said he would not have them if he bought the stock; that he would move the goods out of the store before he paid for them, or that he would pay for them as soon as he had them out of the store, I think the last were his words; that he did not want to have any trouble with them, for fear the creditors might replevy them. We closed the trade on Saturday, and he said he would come in on Sunday and take stock. On Sunday morning, he came in with David Witowsky, Jr., and David Adams; I was there with Mr. Berk. Before we took stock, Mr. Kempner and I had some conversation; he asked me how much I owed Freidlander, Steitch & Co. and several other parties. I told him I owed Freidlander, Steitch & Co. a little over $3000, and named over some other creditors, but I don't remember their names, or the amounts I gave. He said, 'Little Coleman' would have to suffer too. I told him I did not know that; I only owed him a little over $200, and I might pay that bill. We then went to work and took stock. When we got through taking stock, and we were starting for home, he said, 'You had better give me the key of the store, so as to show that the goods are in my possession.' I then gave him the key of the store, and told him I must have the money for the goods by twelve o'clock the next day. He said, you shall have it as soon as I get the goods moved. On Monday morning, I came down to the store about nine o'clock, or between nine and ten, and the goods were already removed.'
 The fifty-five per cent. agreed on between the parties, gave Levison $9725. The bill of the goods sold was, however, made out on the basis of the New York cost, $17,622, and receipted accordingly. The goods were removed to a basement-story, or cellar, at some distance from the store (for the purpose, as Kempner asserted, of saving storage); and the $9725 paid in cash to Levison.
 Levison in his answer given, as in his testimony, admitted the fraud. Kempner in his, denied all fraud on his part, and represented himself as having come from California with $12,000 in gold, his only fortune; that being in Chicago he met Levison, who had also been in California, and whom he had known there; that Levison urged him to buy him out; that after several interviews, Levison sent for him and accepted his offer of fifty-five cents for the dollar of cost, saying, 'Well, you shall have them. I am sick of this business; I want to be in some business in which I shall be occupied all day long doing something.' Kempner's answer further asserted that he knew of no judgments or liens on the property, and that the purchase was not made to forestall or delay Levison's creditors; and it denied the conversation stated by Levison in which he, Kempner, was represented as having urged Levison to make a sale and to disregard his creditors. It asserted that the goods were worth nothing like the cost price, and that the consideration paid was not fraudulently below value, and it charged that the complainant's bill was filed in collusion and conspiracy with Levison, to defraud Kempner, while he, Levison, was permitted to go free, with the money paid him.
 There was a great amount of testimony (the record having had 260 pages) to show fraud. Much of it was not direct, and some of it was more or less contradictory. Numerous persons were examined to show that the cost price of the goods was too high; but they failed to show that it was so to the extent of forty-five per cent. or near it.
 At the time of the sale Levison owed about $15,000. With the cash that Kempner paid him he could show in money and furniture about $13,000, owned by himself. His wife had property.
 As to the conspiracy alleged by Kempner between the complainants and Levison, it appeared that the sale having been made on the 9th, Levison was arrested on the 10th upon the affidavit of a brother-in-law to one of the complainants; that on the 11th, complainant came to Chicago; that he staid until the 14th; that while here he discharged the warrant of arrest of Levison, and employed Levison's previously retained counsel, to collect his debt out of the goods sold to Kempner; that on the 16th (Sunday intervening), Levison confessed judgment to the complainants; that on the 17th he confessed judgments to seven other of the creditors, now complainants, and on the same 17th April this bill was filed as a creditor's bill, on executions returned unsatisfied as against Levison; that none of these demands were due at the time under three months, except one, which rested in open account; that those judgments were confessed in the office of Levison's attorneys; and, that the bill waived an answer on oath.
 The parties defendant were Jews.
 The court below, on view of all the evidence, decreed the sale fraudulent, and Kempner appealed.
 
 Mr. S. A. Goodwin, for the appellant:
 
 We charge that the bill has been filed by collusion between the complainants and Levison, and we think that the dates at which, and the circumstances wherein the judgments were obtained show that.
 But passing to the complainants' case, it is certain that they must establish affirmatively, that the sale was fraudulently intended by Levison, and, as a fact, that Kempner conspired with Levison to cheat and defraud the creditors by having such sale made with the design of keeping the merchandise beyond the reach of process of law; and that the sale was in fact made for such purpose, that is to say, to hinder and delay creditors.[1] These are the allegations of their bill.
 The bona fides of the purchase by Kempner is affirmatively established. Levison's whole indebtedness on the 9th of April, 1866, was within $15,000. He had full $13,000 money and chattels. The complainants do not allege nor show, nor did Levison, as a witness, pretend that he had not notes, claims, and choses in action, or other moneys to meet the balance of $1100 in full. His wife had money. It is incumbent on the complainants to show affirmatively that Levison was bankrupt, before they can charge that the sale was fraudulent. The complainants do not show anywhere in the case, that Levison has not now, nor that he has not always had money enough to pay these creditors all he owes. The answer which the complainant's solicitors drew for him does not deny that he has such money.
 Kempner could not know of a fraudulent purpose which Levison did not entertain, so far as shown, for he (Levison) substantially negatives that. In the absence of that main necessary fact, the complainants have attempted to prove some remarks, which, if substantiated, they seem to suppose would show Kempner cognizant of some wrong intention. But they are all unsatisfactory for the conclusion, and every one of them denied by Kempner and disproved. Besides, if considered proved, they would not indicate knowledge or intent on Kempner's part, that the money paid would not be applied to satisfy creditors. If the sale was honest and fair, and for a fair price, it could make no difference that the creditors might not be paid in full. Purchases are often made of the stocks of insolvents, and rightly and honestly, although such consequences necessarily ensue.
 As to the value of the goods there is a difference of opinion, but the preponderance is with the defendant. Inadequacy of consideration is thus exploded, either as a badge of fraud per se, or as a motive for a fraudulent collusion with Levison. Kempner's purpose of going into trade was a legitimate one. The right to sell was perfect in Levison, either at wholesale or retail. The right to buy and make a good, or even a hard bargain, cannot be denied to a purchaser, there being no fraudulent conspiracy between vendor and vendee.
 The debts of Levison were not due. No suit had been commenced, or even threatened. Kempner could therefore have had no design to place these goods beyond the reach of an execution in behalf of these creditors. Levison's creditors had no lien on them fixed or inchoate. Nor had they begun, or threatened to begin any proceedings to mature a lien. The full price paid put Levison in funds to pay his creditors.
 The Supreme Court of Illinois say, in Waddams v. Humphrey,[2]
 'No matter how much a man may be indebted, he may sell his property for a fair price, or even for a price below the market value, if done honestly and with no view to delay, hinder, or defraud creditors of their just dues. A debtor may sell his property for a fair price, even if he sells it with the avowed intention of defeating an honest claim, if no lien exists to forbid it.'
 It was reasonable prudence for Kempner to remove the goods at once into his own possession after the inventory was made. Prompt possession has never before been urged as a badge of fraud. On the contrary, possession left with the vendor has always been considered ground of suspicion.[3] It is idle to say that the possession was in haste to avoid seizure by creditors. There was not only no such thing threatened, but not one of Levison's creditors was in a position, legally, to touch these goods by attachment, replevin, execution, or other process.
 These parties were all Jews, and with them Sunday is always a seculer and convenient day for any extra work.
 Will it be said that the receipt on the invoice of goods soid, was taken for the whole sum fraudulently? The charge is without foundation. All the parties connected with the sale well knew the amount Kempner was to give. It was openly and notoriously known, and talked about by near a dozen witnesses. How then could Kempner expect to keep it a secret by the form of the receipt?Deeply as the law abhors fraud and crime, it equally abhors the imputation of either, except upon clear and controlling evidence. And the onus is therefore upon the creditor who assails a sale to show the fraud which he relies on.
 Levison's testimony is worth very little, situated as he is, interested to pay his debts with property which he once sold, while he keeps the $10,000 consideration-money in his pocket, and proclaims his own turpitude.
 Mr. Gillet, contra.
 Mr. Justice GRIER delivered the opinion of the court.
 
 
 1
 It has been frequently held that fraud ought not to be presumed, but must be proved. But the evidence of it is almost always circumstantial. Nevertheless, though circumstantial, it produces conviction in the mind often of more force than direct testimony.
 
 
 2
 It would be a troublesome, as well as an unprofitable task, to examine all the very astute arguments, founded on the large mass of testimony contained in the record, to show that the court below have come to a wrong conclusion. It suffices to say that it sufficiently appears that the evidence before the court fully justified their conclusion.
 
 
 3
 It is true that mere inadequacy of consideration, unless extremely gross, does not per se prove fraud. But the direct testimony here confirms the fact that Kempner urged the acceptance of his offer to purchase with arguments such as this: 'There is some pretty rough talk in town about you. You had better not delay this matter. You had better let me have the goods and put the money in your pocket, and let the creditors go to the devil.'
 
 
 4
 The circumstantial evidence amply confirms this direct evidence of fraud.
 
 
 5
 1st. The false receipts given for full value on Saturday.
 
 
 6
 2d. The account of stock made out on Sunday.
 
 
 7
 3d. The removal of the goods into a cellar on Monday.
 
 
 8
 The defendant's endeavor to prove by experts, that the price given was sufficient, tends only to confirm the correctness of the decree of the Circuit Court, which is
 
 
 9
 AFFIRMED WITH COSTS.
 
 
 
 [1]
 Cadogan v. Kennett, 2 Cowper, 434; United States v. Hooe, 3 Cranch, 88; Clements v. Moore, 6 Wallace, 299.
 
 
 [2]
 22 Illinois, 663; and see Hessing v. McCloskey, 37 Id. 342.
 
 
 [3]
 Twyne's Case, 1 Smith's Leading Cases, 1.