## BLENNERHASSETT *v.* SHERMAN.

1. A mortgage of his entire estate, executed by an insolvent mortgagor to a creditor, who knows of his insolvency, and who, for the purpose of giving him a fictitious credit, actively conceals the mortgage, withholds it from record, and represents him as having a large estate and unlimited credit, by which means he is enabled to contract other debts which he cannot pay, is void at common law.

2. A mortgage executed by an insolvent with intent to give a preference to a creditor, who has reasonable cause to believe him to be insolvent, and knows that it is made in fraud of the provisions of the Bankrupt Act, and who, for the purpose of evading them, actively conceals it and withholds it from record for two months, is void, although executed more than two months before the filing of a petition in bankruptcy by or against the mortgagor.

APPEAL from the Circuit Court of the United States for the District of Iowa.

The bill in this case was filed Jan. 26, 1875. The suit was brought to foreclose a mortgage executed by Allen, lately of the city of Chicago, in the State of Illinois, to Allen, Stephens, & Co., of the city of New York, a firm composed of Allen, the mortgagor, and Stephens and Blennerhassett. The bill of complaint set out the mortgage in full, as follows:—

"NEW YORK, 18 Nov., 1874.—I hereby acknowledge the receipt of four hundred and sixty-five thousand four hundred and seventy-six and 88-100 dollars of advance to the Cook County National Bank, of Chicago, for my account, same being made by Allen, Stephens, & Co. in money, paper, and indorsements. I have arranged with them for additional advances. In consideration thereof I hereby grant and convey to Allen, Stephens, & Co., by way of mortgage and security for such advances, all my real estate of every kind and description, and wherever situated.

"B. F. ALLEN."

This instrument was duly acknowledged by Allen before a notary public in the city of New York, and delivered to the complainants, Stephens and Blennerhassett. It was not recorded until Jan. 19, 1875. On that day it was filed for record in Cook County, Illinois, and on the next day in Polk County, Iowa.

The bill charged "that in consideration of said security the complainants had further advanced to said Allen in money and valuable securities, and become personally liable by indorsement of securities for said Allen, in the further sum of four hundred and thirty-four thousand five hundred and twenty-three dollars and twelve cents, making a total amount of advancements and indorsements on account of said security of the sum of $900,000, paid and advanced by your orators, and for which they became liable as indorsers." The bill then gave a description of the real estate which complainants claimed was covered by the mortgage, and prayed for an account of the moneys advanced by the complainants to Allen, and the moneys paid by them on account of the liabilities incurred and the amounts intended to be secured by the mortgage, and for a foreclosure of the same, and general relief.

On Feb. 8, 1875, the mortgage mentioned in the bill was assigned by Allen, Stephens, & Co. to the Charter Oak Life Insurance Company of Hartford, Conn., and on April 17 that company, leave of the court having been obtained allowing it to intervene and become a party complainant, filed a supplemental bill, in which the assignment of the mortgage was averred. A petition in bankruptcy was filed Feb. 23, 1875, against Allen in the United States District Court for the District of Iowa. He was adjudged a bankrupt April 22, and on July 1 following Hoyt Sherman was appointed assignee of his estate.

On Aug. 7, 1875, Stephens and Blennerhassett, and the Charter Oak Life Insurance Company, filed their bill of review, in which they prayed that Hoyt Sherman, the assignee of Allen, might be made a party defendant. Allen was retained as a defendant on account of a claim of homestead which he set up to certain of the property covered by the mortgage.

In this bill, which is called in the record "a bill of revivor and consolidated bill," the complainants averred, that prior to the date of the mortgage Allen had applied to Stephens and Blennerhassett, as copartners in the firm of Allen, Stephens, & Co., in behalf of the Cook County National Bank, to make to the bank, upon his credit and responsibility, certain large advances

of money, commercial paper, and indorsements, and that in pursuance of such application Allen, Stephens, & Co. did make such advances to. the amount of $465,476 prior to the date of the mortgage, and that after its date " they continued to make advances of money and valuable securities to the said Cook County National Bank, at the request of said Allen, and between the said date of the 18th of November, 1874, and the date of the suspension of payment by the said Cook County National Bank, as hereinafter set forth, in addition to the said sum of four hundred and sixty-five thousand four hundred and seventy-six 88-100 dollars, ascertained and acknowledged to have been received at the date of said mortgage, the said Allen, Stephens, & Co. advanced in the aggregate the sum of two million seven hundred and twenty-two thousand two hundred and eighty-four and 29-100 dollars.

" That said Cook County National Bank from time to time, between said dates, to wit, between the said eighteenth day of November, 1874, and the eighteenth day of January, 1875, made remittances to the said firm of Allen, Stephens, & Co., on account of said advances, which remittances were made in currency and in bills receivable, on which currency was realized, and all of which was applied on account, and was sufficient to extinguish and did extinguish wholly the amount so advanced prior to the date of the execution of said mortgage, but was wholly inadequate to pay the amount advanced subsequent to said date. That the balance due on account of said advances and in excess of the credits and remittances aforesaid, on the said eighteenth day of January, 1875, and still due and unpaid, is the sum of nine hundred thousand dollars."

Sherman, the assignee, filed his answer to this bill, in which he averred that the advances made by Allen, Stephens, & Co. prior to the date of the mortgage were made to Allen on his own individual account and for his own use, and not to the Cook County National Bank, but denied that such advances amounted to the sum of $465,476, " or anything like that amount." He admitted the execution of the mortgage, but charged that on and prior to its date Allen was largely indebted to persons and banks in New York City and to the Cook County National Bank; that he was insolvent, his liabil-

ities were more than $1,500,000, and exceeded his assets by at least $600,000; that the Cook County National Bank was embarrassed and unable to pay its debts; and that all these facts were then well known to Stephens and Blennerhassett. That they, desiring to take advantage of the necessities of Allen, and desiring to extort from him a mortgage on his real estate in Iowa and elsewhere, in fraud of his other creditors, falsely represented to him that he was largely indebted to the firm of Allen, Stephens, & Co.; for advances theretofore made to the Cook County National Bank for his account, "and that if he, Allen, would execute to said firm an agreement or mortgage as hereinbefore mentioned, said firm of Allen, Stephens, & Co. would advance, or procure to be advanced, to him an amount that would be sufficient to enable him and the said Cook County National Bank to go on with their business, and that they would continue to make such advances till he and the said bank had gotten over their crippled financial condition, and were able to go on with their business without such assistance; and that if he, the said Allen, would do so, that the same should not be put upon record, and should not in any manner be uttered or published; that it should be held by said Stephens and Blennerhassett, and should be kept from the knowledge of all the general creditors of said Allen, and of said Allen, Stephens, & Co.; that the only use they would make of it would be as a justification to their depositors for making such advances to said Allen, and then only in case any question should be made with them, the said Stephens and Blennerhassett, by such depositors in regard thereto; and that it should in no way or manner have any force or validity, even between the said parties thereunto, unless the said Allen, Stephens, & Co. should advance to said Allen funds sufficient to enable him and the said Cook County National Bank to go on with their business, as above stated, and then that it should be held by them, the said Stephens and Blennerhassett, and in no way used without the consent of the said Allen.

"They further declared to Allen that if he refused to execute said mortgage they would at once cease to make advances to him or the Cook County National Bank, and would take no steps to protect the drafts drawn by the Cook County National

Bank on New York, which would cause its suspension. That Allen being in great need of money, and relying on the representations of Stephens and Blennerhassett, and believing that if he could procure the aid which they promised he could sustain the Cook County National Bank and pay off his debts, and fearing lest Stephens and Blennerhassett would carry out their threats, executed said mortgage."

The answer averred that Allen, Stephens, & Co., on and before Jan. 18, 1875, refused to make the advances, upon the making of which alone said mortgage was to have any validity or effect, even between the parties thereto, and said firm in other respects failed to comply with the promises made, upon the faith of which the said mortgage was executed. That in consequence of the refusal and failure of Stephens and Blennerhassett to comply with their promises, Allen and the Cook County National Bank were compelled to and did suspend payment, and to quit business and go into liquidation, and so it was averred that the said mortgage became null and void.

The answer denied that, after the execution of the mortgage, Allen, Stephens, & Co. continued to make advances to the Cook County National Bank; denied that there was due from Allen or the Cook County National Bank to Allen, Stephens, & Co. the sum of $900,000, and averred that Allen and the Cook County National Bank had paid and delivered to Allen, Stephens, & Co., in money and securities, sufficient to satisfy all the advances of said firm to Allen and the Cook County National Bank, if any such were made.

It was further averred in the answer as follows: —

"That on and prior to the eighteenth day of November, 1874, the date of said pretended mortgage, the said Allen and the said Cook County National Bank was each insolvent and unable to pay their debts; that said firm of Allen, Stephens, & Co., as well as the several members thereof, had, at and prior to such date, reasonable cause to believe said Allen and said bank were each insolvent; that said firm fraudulently procured said Allen to execute and deliver said pretended mortgage, knowing it was made to and would give said firm a preference over the other creditors of said Allen, and that it was made in fraud of the provisions of the bankrupt

law, and the more effectually to perpetrate such fraud on the general creditors of said Allen at the time said mortgage was executed and delivered, and said Stephens and Blennerhassett, for themselves and said firm, agreed to conceal the same, not to publish the same or put the same on record; and in pursuance of such agreement they did, with intent to defraud the general creditors of said Allen, keep the same in their possession for two months after it was executed, and until the nineteenth day of January, 1875, and until they had positive knowledge that the said Allen and the said Cook County Bank would be compelled to suspend, when said pretended mortgage, or a copy thereof, was fraudulently, and for the purpose of creating an illegal preference in their favor, filed for record in the recorders' offices in the different counties in Iowa and Illinois wherein the real estate of said Allen is situated. That while said mortgage was, as aforesaid, secretly kept by said Stephens and Blennerhassett, it had no effect or validity as against the other creditors of said Allen, and that as to them (if valid between the parties to it, which this respondent denies) it only took effect at and from the time the same was filed for record, which was within the two months next prior to the filing of the petition in bankruptcy against the said Allen, and on which he was adjudged a bankrupt as aforesaid; and that the same is fraudulent and void under and by virtue of the provisions of the national bankrupt law and the amendments thereto, and that the same is now a cloud upon the said real estate then owned by said Allen, the title of which has passed to your orator as the assignee of said bankrupt, and it ought by the decree of this honorable court to be so declared, and said cloud removed."

The complainants filed the general replication to this answer.

Afterwards, on Jan. 17, 1876, an amendment was filed to the said "consolidated bill," in which it was averred that, by the application of money collected by Allen, Stephens, & Co. from collateral securities held by/them to secure the amount due them from the Cook County National Bank, the amount of such indebtedness had been reduced to the sum of $784,000, by reason whereof the said firm of Allen, Stephens, & Co. had no longer any beneficial interest in said mortgage, but the

entire and-absolute interest in and ownership of said mortgage was held and owned by the Charter Oak Life Insurance Company.

Sherman, as assignee of Allen, filed his cross-bill against Stephens, Blennerhassett, and the Charter Oak Life Insurance Company, alleging the invalidity of said mortgage on substantially the same grounds as those set up in the answer, and praying that the mortgage mentioned in the original bill might be declared fraudulent and void, and that the cloud upon the title to the real estate of the bankrupt, Allen, created by the registry of the same, might be removed. The defendants to the cross-bill filed their answer thereto, to which Sherman, the assignee, filed the general replication.

It is unnecessary to state the pleadings in greater detail. Proofs were taken; and upon final hearing the Circuit Court dismissed the original bill and made a decree in accordance with the prayer of the cross-bill, declaring the mortgage to be null and void, and cancelling the same. The appeal of the complainants brings up this decree for our consideration.

The defendants in the court below contended that the mortgage was void, because —

*First*, It was procured by fraud and used without the consent of Allen, and was given and received to hinder, delay, and defraud his creditors.

*Second*, It was concealed and kept from the records from its date until Jan. 19, 1875, and until after Allen failed, and that such concealment gave him and the Cook County National Bank a delusive and fictitious credit, thereby enabling him, under the semblance of being the owner of a large amount of unincumbered real estate, to deceive and mislead other persons to give him credit which would otherwise have been withheld, by reason of which he did contract debts after the giving of this mortgage, now remaining unpaid, of a greater amount than the value of the real estate covered by this mortgage. Many of these debts were contracted by Allen, Stephens, & Co. upon the representations of W. A. Stephens and H. Blennerhassett, members of said firm, while they held this mortgage in concealment; that his real estate was a vast property and was unincumbered.

*Third,* This mortgage was a fraudulent preference under the provisions of sects. 5128, 5129, and 5130c of the Revised Statutes of the United States, under the title of bankruptcy then in force.

*Fourth,* If the instrument was valid, it was given to secure a debt of Allen, and not a debt of the Cook County National Bank, and that he did not then, nor does he now, owe Allen, Stephens, & Co. anything.

*Fifth,* If the advances were made by Allen, Stephens, & Co. to the Cook County National Bank, such advances would create no valid debt against the said bank under sect. 5202 of the Revised Statutes of the United States ; and being no debt there can be no mortgage.

*Sixth,* The instrument is not a legal mortgage, for the reason that it describes neither debt nor real estate.

The case was argued by *Mr. C. C. Nourse* and *Mr. A. P. Hyde* for the appellants, and by *Mr. J. S. Polk* and *Mr. L. H. Bisbee* for the appellees.

MR. JUSTICE WOODS, after stating the case, delivered the opinion of the court.

After an attentive consideration of the evidence in this case, much of which is conflicting and irreconcilable, we have reached the conclusion that the mortgage, which is the basis of the suit, is fraudulent and void at common law, because it was accepted by Allen, Stephens, & Co., and used by them to hinder, delay, and defraud the creditors of Allen, the mortgagor, and that it is also void under that section of the Bankrupt Act now embodied in the Revised Statutes of the United States as sect. 5128.

We shall state the grounds of our conclusion as succinctly as the case will admit. We are relieved from any discussion of the question of the insolvency of Allen, the mortgagor, by the admissions of counsel for the appellants. They concede, and, in our judgment, the evidence abundantly shows, that he was insolvent not only at the date of the mortgage, on Nov. 18, 1874, but also at the date of its registration, on Jan. 19, 1875. It is conceded that at the same dates the Cook County National Bank was also insolvent. We may add to this con-

cession, what is perfectly clear from the evidence, that the insolvency of both Allen and the bank was actual and absolute; that their assets were largely insufficient to pay their debts.

In order to a clear understanding of the controversy between the parties, it will be necessary to state generally the financial history of Allen and of the firm of Allen, Stephens, & Co., of which he was the senior member prior to the date of the mortgage.

Allen commenced business as a private banker in Des Moines, Iowa, in 1856, and soon began dealing in Iowa lands. He bought claims, made entries, and located them mainly in Polk County, Iowa. The real estate of which he was seised at the date of this mortgage had cost him $242,616, and that of which he was seised on Jan. 18, 1875, had cost him $240,794.

He continued his business as a banker in Des Moines up to a short time before the proceedings in bankruptcy were instituted against him. On Oct. 31, 1867, he was appointed by the Circuit Court of the United States for the District of Iowa receiver in the case of *Mark Howard* v. *The City of Davenport*, then pending in that court, and as such there came into his hands five hundred and forty-one bonds of $1,000 each of the Chicago, Rock Island, & Pacific Railroad Company, and between $90,000 and $100,000 in cash. The bonds bore seven per cent interest per annum, which Allen collected as it fell due, amounting to $37,870 per annum. He continued the custodian of this entire fund until May, 1873.

In 1868, according to his evidence, which is corroborated by his books, his assets amounted to $1,641,017, and his liabilities, including his indebtedness as receiver, amounted to $1,466,131, leaving an excess of assets over liabilities of $174,886. Of these assets $150,000 were invested in his house and furniture, in addition to the cost of the land, one hundred and thirty acres, on which his house stood.

It is, therefore, apparent that at the time mentioned he had little or no available capital of his own with which to carry on business. This state of his affairs caused him to succumb to the temptation to use the trust assets in his possession as receiver. Towards the close of the year 1868 he had deposited

a part of the Chicago, Rock Island, & Pacific Railroad bonds (which we shall call, for the sake of brevity, Rock Island bonds), which belonged to this trust fund, with Gilman Son & Co., bankers in the city of New York, and borrowed upon them, as collateral security, the sum of $55,000. At this time Blennerhassett was the confidential clerk of Gilman Son & Co.

On Nov. 2, 1868, Blennerhassett left that firm and became a partner in the banking-house of George Opdyke & Co., in which Stephens was already a partner. At the solicitation of Blennerhassett, Allen, on Dec. 19, 1868, changed his account from Gilman Son & Co. to George Opdyke & Co. During the years 1869, 1870, and 1871, it is made clear by the letters of Allen to Opdyke & Co., which appear in the record, that he was pressed for money and embarrassed. During this time he was speculating largely in the stock of the Chicago, Rock Island, & Pacific Railroad Company, and had used through Opdyke & Co. a large part of the Rock Island bonds, which belonged to the receiver fund in his possession.

In the fall of 1871 Stephens and Blennerhassett began negotiations with Allen with a view to a partnership between the three to carry on the business of banking in the city of New York, which resulted in the creation of the partnership of Allen, Stephens, & Co., which began business on Jan. 1, 1872.

It was agreed that Allen should furnish the capital on which the partnership was to do business. The amount named was $50,000.

At this time Allen was largely insolvent, and neither Stephens nor Blennerhassett had any means. Allen never contributed any money or property to the partnership capital. Stephens and Blennerhassett were not required by the partnership articles to pay anything, and they paid nothing. The firm, therefore, started without any capital whatever; two of the partners had no property, and the other owed more than he could pay.

The complainant, the Charter Oak Life Insurance Company, at once made a large deposit with the new firm, and in a few days their deposits amounted to more than $200,000. With the funds thus placed in their hands they paid the over-drafts

of Allen on Gilman Son & Co., and received from them the securities which had been deposited with them by Allen, namely, 168 Rock Island bonds of $1,000 each, certificates of 3,050 shares of stock of National State Bank of Des Moines, and of 960 shares of First National Bank of Des Moines.

It is unnecessary to trace minutely the shifts and devices to which Allen resorted to keep afloat. They are fully shown by the record. On Oct. 7, 1872, it appears from a letter addressed to him by Stephens for the firm of Allen, Stephens, & Co., that he was indebted to the firm in the sum of $379,000, and the security held by the firm was 416 Rock Island bonds. That these were the bonds which belonged to the fund of which he was receiver, the record leaves no doubt. He so testifies; and there is no conflicting testimony, and his possession of so large an amount of these bonds is not otherwise accounted for.

He at various times pledged all the bonds which belonged to the receiver fund. They all passed through the hands of New York brokers as collateral security for loans made to him. In January, 1873, all the Rock Island bonds held by him as receiver were in the hands of a broker in New York, held by him as security for advances made to Allen. This broker continued to borrow upon them for Allen until July 1, 1873, when he commenced selling, and continued to sell them until October, 1873, before which nearly all were disposed of, some of them at quite low prices.

During the months of February, March, and April, 1873, Allen paid the broker who negotiated these loans for him the sum of $43,000 extra interest over and above seven per cent on the loans.

Before May, 1873, it fairly appears from the evidence that Allen's losses had entirely consumed the receiver fund. In the month just mentioned he was ordered to pay into court by the middle of July the 541 bonds of $1,000 each, which had come into his hands as receiver, or their equivalent in money. The residue of the fund, amounting to about $300,000, was to be paid in May of the following year. He was in a desperate strait, and resorted to desperate means to save himself. On May 30, 1873, he purchased $275,000 of the stock of the Cook County National Bank of Chicago, Illinois, which gave him the

control of the bank.   He paid for a large part of this stock by his checks on the bank, and the residue by a check on Allen, Stephens, & Co.

Having thus obtained the control of the Cook County Bank, which had a deposit of $1,300,000, he paid the $541,000 demanded of him as a part of the receiver fund, mainly by his checks on the bank.   At this time the larger part of the receiver's bonds had been sold and their proceeds applied to the payment of moneys borrowed by him in New York on the pledge of the bonds.

In the fall of 1873 he bought an interest in the New York, State Loan and Trust Company.   His purchases of stock in that institution amounted to nearly $200,000.   He paid for this stock by giving his notes and a check on the Cook County Bank.   His object in making this purchase, as he states it, was to get control of the institution, and be enabled thereby "to carry his assets until he could realize on them."   In other words, he bought the stock on credit with a view to get in his hands the cash assets of the Trust Company.

During the panic of September, 1873, the Cook County Bank lost $100,000 by the purchase of worthless drafts drawn by one Badger.   The bank suspended a short time, but soon resumed.

During the fall of 1873, the private bank of Allen at Des Moines, and the National State Bank of Des Moines, in which he was a large stockholder, were both overdrawn with the house of Allen, Stephens, & Co.   They were both hard pressed for money.

In January, 1874, Allen sold, through the house of Allen, Stephens, & Co., to the Charter Oak Life Insurance Company, bills receivable, "in the shape of mortgages," drawn from his private bank in Des Moines, to the amount of $114,000.   This money all passed through the books of his private bank at Des Moines.

In May, 1874, the house of Allen, Stephens, & Co. made a loan of $400,000 to two men of the name of Hussey and Gisbourne, and took for security a deed of trust to Stephens upon a silver mine, called the Mono mine, in Utah Territory.   The Charter Oak Life Insurance Company took one-third of this

loan off the hands of Allen, Stephens, & Co.  The mine proved worthless, and the entire loan was a total loss, taking from Allen, Stephens, & Co. $266,666.  This largely exceeded all the profits made by the firm since it commenced business, and left it insolvent.

In October, 1874, it was arranged between Allen and the Charter Oak Life Insurance Company, the negotiation therefor having been carried on through Allen, Stephens, & Co., that he should make his twelve notes for $25,000, payable in five years from date, and deliver the same to the company, and secure the same by pledge of mortgage notes, stocks, and bonds.  The company was to advance to Allen $300,000 on the notes so secured.  Allen, on Oct. 24, 1874, made his notes accordingly, and delivered them to Allen, Stephens, & Co. for the company, and the company sent $300,000 of its paper to Allen, Stephens, & Co. to be used for his benefit.  His notes were secured by the pledge of mortgage notes, amounting to $277,041; by Cook County Bank stock, $70,000; New York State Loan and Trust Company stock, $100,000; National State Bank of Des Moines stock, $30,000; and county bonds, $500; amounting in all to $478,000.

On the same day Allen, for himself, executed to Allen, Stephens, & Co. a paper-writing, in which he authorized them, in case he became indebted to them for loans or advances, or liabilities assumed by them for him, to sell, without notice to him, any property, things in action, collateral securities belonging to him and held by them, or to hypothecate the same and use their proceeds towards the payment of such indebtedness and the interest.  On the same day he, as president of the Cook County Bank, executed and delivered to Allen, Stephens, & Co. a similar paper.

Between the date of his appointment as receiver, and Oct. 24, 1874, Allen had sustained great losses.  In 1871 he had lost by stock speculations in New York City $200,000.  He had lost $50,000 by a subscription to the Canada Southern Railroad.  He built for a church society at Des Moines a church edifice, in which was tied up the sum of $60,000, and which afterwards resulted in a loss of $50,000.  In 1873 and 1874 he had lost $200,000 as a member of the firm of B. F. Murphy &

Co., and $75,000 as a member of the firm of H. M. Bush & Co., and $30,000 in the firm of Lewis & Stephens. In swamp, coal, and mountain lands he lost $61,000. He lost in corn speculations in Chicago and in property in the towns of South Evanston, Ill., and Sheffield, Ind., $92,000. He sunk $35,000 in the stock of the Toledo, Wabash, and Western Railroad Company, and lost $30,000 in the firm of A. T. Andreas & Co., and $10,000 invested in the Grand Pacific Hotel in Chicago. Besides his residence and furniture at Des Moines, which cost him $150,000, he had invested in a residence in Chicago $50,000. His actual losses amounted to over a million dollars, and he had $200,000 invested in unproductive real estate. It is true so inveterate a speculator sometimes made a fortunate venture, but his losses were greatly in excess of his gains.

The mortgage on which this suit is founded was given on Nov. 18, 1874. On that day the firm of Allen, Stephens, & Co. was insolvent, and Stephens and Blennerhassett must have known it. Their profits, since Jan. 1, 1872, when the partnership was formed, had not exceeded $200,000. They began with no capital. Both Stephens and Blennerhassett had drawn out their share of the profits. Allen's share remained, which was one-third, and amounted to about $66,000. The loss of the firm in the Mono mine loan was $266,000, leaving a deficit of $200,000. As already stated, it is conceded that at the date of the mortgage both Allen and the Cook County Bank were insolvent. But they were not merely insolvent, but irretrievably so.

On that day Allen owed the depositors in his private bank at Des Moines $736,783, he owed the Cook County Bank $557,943, the Charter Oak Life Insurance Company $300,000, the Newark Savings Institution of Newark, N. J., $200,000, making an aggregate of $1,794,726. At the same time, placing a liberal estimate on the value of his assets, they did not exceed $800,000, leaving a deficit of $994,727, which other smaller items of indebtedness shown by the record would swell to more than a million dollars, the excess of his liabilities above his assets. The condition of the Cook County Bank on the same day may be approximately ascer-

tained from the following facts: On Nov. 18, 1874, its books showed its indebtedness to be $1,891,620. The receiver of the bank testifying on Aug. 26, 1876, said that he had admitted and given certificates for claims against the bank to the amount of $803,035, that other claims had been presented to the amount of $915,000, for which receiver's certificates had not been given, and that the amount collected from its assets was $92,000. The cash on hand when the receiver took possession was $4,000.

· Such was the condition of the firm of Allen, Stephens, & Co., Allen, and the Cook County Bank when the mortgage in suit was executed.

There are several propositions of fact which, in our opinion, the evidence satisfactorily shows. A statement and discussion of the evidence which sustains them would extend this opinion beyond reasonable limits, and would not be profitable.

*First*, Allen when he gave the mortgage, and Stephens and Blennerhassett when they took it, knew that both he and the Cook County Bank were insolvent. A large part of the correspondence between Stephens and Blennerhassett and the firm of Allen, Stephens, & Co. on the one hand, and Allen on the other, commencing before the partnership of Allen, Stephens, & Co. was formed, down to the date of the mortgage, is to be found in the record. The record also contains the correspondence between the firm and the Cook County Bank, and many letters written by the firm, in the interest of Allen, and much correspondence between Stephens and Blennerhassett. This evidence shows that both he and the Cook County Bank were on the verge of suspension from the time when he was compelled to replace the bonds intrusted to him as receiver, down to the date of the mortgage in November, 1874, and the suspension of payment by him and the bank in January, 1875. It also brings home to Stephens and Blennerhassett the knowledge of the desperate shifts and devices to which he and the bank were driven to meet their engagements, and keep the fact of their utter bankruptcy from the knowledge of the public. It. is impossible that men of much less business experience and intelligence than they are shown to be should know what they did of the resources and practices of Allen and the

Cook County Bank, and not have known of the insolvency of both.

Notice of his insolvency was also brought home to Stephens and Blennerhassett by their knowledge of the fact that he had appropriated to his own schemes and speculations a fund which, principal and interest, amounted to over $800,000, committed to his custody as a trustee and receiver. The evidence that they knew of the fact of his appointment as receiver, the amount of the fund which came to his hands, and the appropriation of the fund to his own uses is conclusive.

During the sixty days which elapsed between the date of the mortgage and its registration, the proofs of the insolvency of Allen and the Cook County Bank accumulated, and Stephens and Blennerhassett knew that the insolvency was hopeless and irretrievable.

*Second*, The record shows that the mortgage covered all the property of Allen. His personal property had long been exhausted, and his real estate was all that remained which was not pledged for his debts.

*Third*, In order that the credit of Allen and the Cook County Bank might not be impaired, the mortgage was purposely withheld from record, and actively concealed by Stephens and Blennerhassett until after the suspension of both Allen and the Cook County Bank on Jan. 18, 1875.

Blennerhassett testifies that after its execution he disposed of the mortgage as follows: " I put it in our safe, and kept it there until December 1, when I gave it in a sealed parcel to A. N. Denman. I said to Denman something like this : ' Here is a sealed package which contains instructions and valuable documents; you will go to Chicago, take quarters at some hotel there, and remain there, never leaving the hotel for any great length of time ; and should a telegram come, you are to open that parcel and obey instructions.' "

The instructions directed Denman, when ordered by telegram to act, to have the mortgage recorded in Chicago, and then catch the first train for Des Moines, Iowa, and have it recorded there, &c.

On Jan. 18, 1875, Allen and the Cook County Bank both suspended. On the next day Allen, Stephens, & Co. sent a

telegram to Denman at Chicago, as follows: "Open your instructions and act." Denman opened his instructions and followed them. He filed the mortgage for record in Chicago on January 19, and in Des Moines on January 20.

*Fourth,* While the mortgage was thus kept from the record and from public knowledge, Stephens and Blennerhassett were busily engaged in sustaining the credit of Allen and the Cook County Bank, and, to accomplish their end, falsely and fraudulently represented him to be a man worth over a million of dollars, and of unlimited credit, and the Cook County Bank to be sound and good.

*Fifth,* That by means of these representations of Stephens and Blennerhassett, and the concealment of the mortgage, and the withholding of it from the record, the creditors of Allen and the Cook County Bank were misled and deceived, and in consequence thereof they did, between the date and the registration of the mortgage, deposit large sums of money in Allen's private bank at Des Moines, and in the Cook County Bank, and, at the instance of Stephens and Blennerhassett, discounted the paper of Allen and the Cook County Bank to a large amount, and that such deposits and discounts, though due, still remain unpaid.

*Sixth,* That the mortgage was made by Allen, who was insolvent, with a view to give a preference to the firm of Allen, Stephens, & Co., the firm being a creditor of Allen individually, and the firm and all its members having reasonable cause to believe him to be insolvent, and knowing that the mortgage was made in fraud of the provisions of the Bankrupt Act, and it was withheld from the record and actively concealed for the period of two months preceding the failure of Allen and the filing of the petition in bankruptcy against him, for the purpose of protecting it from assault as a preference void under the provisions of the Bankrupt Act.

There is a large mass of evidence in the record, which in our opinion establishes the truth of the foregoing propositions beyond controversy. The new debts which were contracted by Allen and the Cook County Bank, after the date of the mortgage and before its registration, on the strength of the representations of Stephens and Blennerhassett, and the fact

that Allen's property appeared to be unincumbered, amounted to a larger sum than the value of the real estate covered by the mortgage.

By the aid of the means thus obtained, Stephens and Blennerhassett were able to stave off the suspension of Allen and the Cook County Bank for a period of exactly two months after the date of the mortgage. They, doubtless, supposed this lapse of time would render the mortgage proof against any attack by an assignee in bankruptcy of his estate. He and the bank were then allowed to fail, and the mortgage was placed on record.

Upon this state of facts we are of opinion that the mortgage was a fraud upon the creditors of Allen, and, therefore, void at common law and without regard to the provisions of the Bankrupt Act.

It is not to be disputed that, except as forbidden by the bankrupt law, a debtor has the right to prefer one creditor over another, and that the vigilant creditor is entitled to the advantage secured by his watchfulness and attention to his own interests. Neither can it be denied that the mere failure to record a mortgage is not a ground for setting it aside for the benefit of subsequent creditors who have acquired no specific lien on the property described in the mortgage.

But where a mortgagee, knowing that his mortgagor is insolvent, for the purpose of giving him a fictitious credit actively conceals the mortgage which covers his entire estate and withholds it from the record, and while so concealing it represents the mortgagor as having a large estate and unlimited credit, and by these means others are induced to give him credit, and he fails and is unable to pay the debts thus contracted, the mortgage will be declared fraudulent and void at common law, whether the motive of the mortgagee be gain to himself or advantage to his mortgagor.

It is not enough, in order to support a settlement against creditors, that it be made for a valuable consideration. It must be also *bona fide*. If it be made with intent to hinder, delay, or defraud them, it is void as against them, although there may be in the strictest sense a valuable or even an adequate consideration. *Twyne's Case*, 3 Rep. 80 ; *Holmes* v.

*Penney*, 3 Kay & J. 90; *Gragg* v. *Martin*, 12 Allen (Mass.), 498; *Brady* v. *Briscoe*, 2 J. J. Marsh. (Ky.) 212; *Bozman* v. *Draughan*, 3 Stew. (Ala.) 243; *Farmers' Bank* v. *Douglass*, 11 Smed. & M. (Miss.) 469; *Bunn* v. *Ahl*, 29 Pa. St. 387; *Root* v. *Reynolds*, 32 Vt. 139; *Kempner* v. *Churchill*, 8 Wall. 362; Kerr on Fraud and Mistake, 200.

As long ago as the case of *Hungerford* v. *Earle* (2 Vern. 261), it was held that "a deed not at first fraudulent may afterwards become so by being concealed or not pursued, by which means creditors are drawn in to lend their money." This doctrine has been repeatedly reaffirmed. *Hildreth* v. *Sands*, 2 Johns. (N. Y.) Ch. 35; *Scrivenor* v. *Scrivenor*, 7 B. Mon. (Ky.) 374; *Bank of the United States* v. *Housman*, 6 Paige (N. Y.), 526.

In *Coates* v. *Gerlach* (44 Pa. St. 43), a deed of land had been made directly by a husband to his wife. The deed bore date March 23, 1857, but was not filed for record until Dec. 2, 1857. On Jan. 21, 1858, the husband, professing to act for his wife, sold the land to a third party. The creditors of the husband attached the unpaid part of the purchase-money in the hands of the vendees, and between them and the wife a contest arose on the question which had the better right to the proceeds of the sale. Touching this controversy, Mr. Justice Strong, delivering the opinion of the court, said: "There is another aspect of the case not at all favorable to the wife. It is that she withheld the deed of her husband from record until Dec. 2, 1857. In asking that a deed void at law should be sustained in equity, she is met with the fact that she asserted no right under it, in fact concealed its existence until after her husband had contracted the debts against which she now seeks to set it up. There appears to have been no abandonment of possession by the husband. Even if the deed was delivered on the day of its date, the supineness of the wife gave to the husband a false credit, and equity will not aid her at the expense of those who have been misled by her laches."

So in *Hilliard* v. *Cagle* (46 Miss. 309), it was held that a deed of trust in the nature of a mortgage, valid on its face, and not made or received with any intent to defeat existing or future creditors, may nevertheless be held to be fraudulent and void

as to all creditors, existing and future, by evidence *aliunde*, showing the conduct of the parties in their dealings in reference to the deed. The principal circumstance relied on in this case to avoid the deed was the fact that the grantor retained possession of the property and the deed was withheld from record, and the mortgagor was thereby enabled to contract debts upon the presumption that the property was unincumbered. The court declared that " the natural and logical effect of the agreement and assignment, and the conduct of the parties thereto, was to mislead and deceive the public, and induce credit to be given to the mortgagor, which he could not have obtained if the truth had been known; and, therefore, the whole scheme was fraudulent as to subsequent creditors, as much so as if it had been contrived from that motive and for that object."·

In the case of *Gill* v. *Griffith & Schley* (2 Md. Ch. 270), the court decided that a party cannot be permitted to take a bill of sale or mortgage of chattels from another for his own security, leave the mortgagor in possession and ostensibly the owner, and at his request and to keep the public from a knowledge of its existence withhold it from record for an indefinite period, renewing it periodically, and then receive the benefit of it by placing the last renewal upon record, to the prejudice of others whom the possession and ostensible ownership of that very property by the mortgagor have induced to confide in him. The mortgage which was in controversy in this case was, therefore, declared void. Upon appeal, the court of appeals affirmed the decree for the reasons assigned by the Chancellor. See note of the reporter at the end of the case.

So in the case of *Hafner* v. *Irwin* (1 Ired. (N. C.) L. 490), which grew out of the making of a deed of trust by one Dwight to the plaintiff Hafner, to secure certain creditors named thereon, it was said : —

" There was evidence tending to show that it was a condition of this instrument, and as understood between the parties thereto, that it should not be registered nor put in use; but kept a secret from the world until after the 20th of February ensuing the date. . . . There was also evidence tending to

show that it was a further part of the agreement between the parties that the transaction should be kept secret, at all events until the debtor should escape beyond the reach of the process of his creditors. . . . We need not and cannot lay down as a rule of law that those who take securities from a debtor about to abscond must apprise creditors of his intention to place himself beyond their reach, under penalty of forfeiting such securities ; but we feel ourselves justified in holding that, when secrecy is part of the consideration of such securities, the securities are contaminated thereby, and ought not to be regarded as given *bona fide*."

In *Hildeburn* v. *Brown* (17 B. Mon. (Ky.) 779), a mortgage was executed by one Sherrod to the plaintiffs, which they withheld from record. Commenting on that fact, the court said : —

" The petition of appellants avows that the arrangement between their agents and Sherrod was to withhold the mortgage from registration, for the purpose of sustaining the latter in business, and ' not to record the same unless there was danger of Sherrod's failure.' . . . The effect of the arrangement, though it may not have originated in any actual fraudulent or evil purpose, was to secrete from the public eye the true condition of the debtor, and thereby enable him, under the semblance of being the owner of unincumbered real estate, to deceive and mislead other persons by inducing them, upon the faith of his supposed unembarrassed condition, to give him credit which would otherwise have been withheld. Such contrivances or acts, though not designed to perpetrate an actual fraud upon other persons, have an inevitable tendency that way, and are obviously opposed to the general policy of the law requiring the public registration of all liens and incumbrances upon property permitted to be retained and claimed by debtors.

" If not directly within that class of acts which the law denominates constructive frauds, it approximates so nearly to it that the party avowing himself a participant in such transaction ought not to receive the countenance or aid of the Chancellor in enforcing any lien or claim growing out of it as against a third person."

*Neslin* v. *Wells* (104 U. S. 428) arose in the Territory of Utah, where the law permitted, but did not require, the registration of mortgages, but where there was a general custom to record such instruments. Neslin, the vendor of land, took from Smith, his vendee, a mortgage to secure a part of the purchase-money, but did not file it for record until after a subsequent mortgage executed by the vendee on the same land, to one Kerr, had been filed for record, Kerr having no notice, actual or constructive, of the prior mortgage to Neslin. It was held by the court, Mr. Justice Matthews delivering its opinion, that, "under the circumstances of the case, there arose a duty on the part of Neslin, the vendor, to record his purchase-money mortgage, towards all who might become subsequent purchasers for value in good faith, a breach of which in respect to Kerr, the subsequent mortgagee, without notice, constituted such negligence and laches as in equity requires that the loss which in consequence thereof must fall on one of the two, shall be borne by him by whose fault it was occasioned."

See also *Worseley* v. *De Mattos*, 1 Burr. 467, and *Tarback* v. *Marbury*, 2 Vern. 510.

The principles upon which these decisions are based are, in our opinion, conclusive of this case. None of the cases cited disclose such a premeditated and contrived purpose to deceive and defraud other creditors of the mortgagor as appears in this. We are of opinion, therefore, that the mortgage executed by Allen to Allen, Stephens, & Co., on Nov. 18, 1874, which the complainants in this case seek to foreclose, is a fraud upon the creditors of Allen, and void at common law.

We further declare that a mortgage executed by an insolvent debtor, with intent to give a preference to his creditor, who has reasonable cause to believe him to be insolvent, and knows it to be made in fraud of the provisions of the Bankrupt Act, and who, for the purpose of evading the provisions of that act, actively conceals and withholds it from record for two months, is void under the Bankrupt Act, notwithstanding the fact that it was executed more than two months before the filing of a petition in bankruptcy by or against the mortgagor.

If the mortgage had been executed within the period of two

months next before the filing of the petition in bankruptcy, it would have been void under the letter of the Bankrupt Act. Where all the other circumstances necessary to render it void concur, the device of concealing it until the two months have elapsed cannot save it. It is, notwithstanding the lapse of time, a fraud on the policy and objects of the bankrupt law, and is void as against its spirit.

The conduct of the mortgagees in this case shows them to be without claim to the consideration of a court of equity. On the contrary, it clearly appears to be the duty of the court to take care that they shall not reap the fruits of their fraudulent practices. Their assignee of the mortgage, the Charter Oak Life Insurance Company, stands in no stronger position.

*Decree affirmed.*

MR. JUSTICE GRAY did not sit in this case, nor take any part in deciding it.