<hr />

## BUNCH v. SCHAER.

Opinion delivered January 7, 1899.

FRAUDULENT AGREEMENT — CONCEALMENT OF DEEDS. — A vendee who, by agreement or understanding with his vendor, withholds from record and keeps secret his deed of conveyance to valuable property, and allows the vendor to hold himself out as the owner of such property, cannot, if the vendor becomes insolvent, set up his title to such property as against one who has in good faith parted with his goods and credited such vendor in the belief that he still owns the property. (Page 104.)

Appeal from Pulaski Chancery Court.

THOMAS B. MARTIN, Chancellor.

Morris M. Cohn and Jos. Loeb, for appellant.

A voluntary conveyance, made in contemplation of insolvency, is void as against subsequent creditors, if the debtor may be reasonably supposed to have had in contemplation, at the time of the conveyance, the contracting of debts. 56 Ark. 73; 50 Ark. 46; 38 Ark. 427; Bump. Fr. Con., chap. 13; Wait, Fr. Con. §§ 96, 98, 100, 101; 59 Ark. 614; 8 Wheat. 229. A conveyance for the use and benefit of the grantor is not good against creditors. 52 Ark. 458; 59 Ark. 614. Even if the deed had been valid in the first place, the collusive concealment of its existence renders it of no force as against those who contracted with the grantor under the mistake thus induced as to the ownership of the land. 43 N. W. 411; 105 U. S. 100, 117; 2 Vern. 261; 44 Pa. St. 43; 46 Miss. 309; 2 Md. Ch. 270; 1 Ired. (N. C. Law) 490; 17 B. Mon. 779; 104 U. S. 428; 2 Vern. 510; 7 B. Mon. 374; 6 Paige, Ch. 526; 109 Mo. 40; 123 Mo. 141; 7 S. E. 743; 52 Ark. 458; 41 N. W. 514; 58 Ark. 297; 62 Ark. 22.

*G. W. Murphy* and *John Barrow*, for appellees.

The evidence does not show any intent to defraud. The question here is one of intent. 59 Ark. 614; 76 N. W. 151; 72 N. W. 648.

RIDDICK, J. This action was brought by appellant, T. H. Bunch, to set aside a conveyance of certain land made by Clem Schaer and wife to Jos. F. Schaer, and to declare the same fraudulent and void as to the creditors of said Clem Schaer. The conveyance in question was made on the 15th day of June, 1895. At that time Clem Schaer was engaged in the grain and feed business in Little Rock.

He or his wife was the owner of a homestead in Little Rock of the value of $4,500, the size of which was 75 feet by 150 feet. He owned 40 acres of land adjoining Argenta or North Little Rock, which was divided into lots, and known as "Schaer's Addition." The value of this "Addition," as stated by different witnesses, varied from about $4,000 to over $15,000, though it is probable that its actual cash value was much nearer the first than the last named sum. Besides the above mentioned land, he owned also 47 acres of land in Pulaski county, worth $2.50 per acre, and 292 acres in Ouachita

county, worth from two to four dollars per acre. Besides this
real estate he owned no other property except his stock in trade,
a few cattle, a wagon, buggy and team. Though not insolvent,
Schaer at the time he executed this conveyance was financially
embarrassed. His homestead had been mortgaged. He was so
unfortunate as to become liable as a surety upon the bond of a
defaulting officer. A judgment for the sum of $1,800 had been
recovered against him as such surety. To obtain money to
satisfy this judgment, and to pay claims of other parties that
were pressing, he was compelled to give to Jacob Niemeyer a
second mortgage upon his homestead and upon "Schaer's Addi-
tion" in the sum of forty-three hundred dollars. Schaer and his
wife became apprehensive that they might not be able to pay these
mortgages and might lose their homestead. With a view of reliev-
ing the homestead of these liens, they executed to Jos. Schaer,
a cousin and intimate friend of Clem Schaer, the deed in ques-
tion here. By this deed they conveyed to him "Schaer's Addi-
tion," and also the other land owned by Schaer in Pulaski
county besides his homestead. The consideration recited by the
deed is that Jos. Schaer paid five dollars, and assumed the pay-
ment of the Niemeyer mortgage debt of $4,300. The appellant
contends that this conveyance was colorable only, gotten up for
the purpose of defrauding the creditors of Clem Schaer, and
that Jos. Schaer neither paid nor intended to pay anything for
such conveyance. But we find it unnecessary to discuss that
question.

The deed was delivered to Jos. Schaer at the home of Clem
Schaer. Joseph did not keep the deed nor have it recorded
until months afterwards, but, so soon as he received it, he at
once handed it to the wife of Clem Schaer, and told her to keep
it for him. He also, so he states, appointed Clem his agent,
and authorized him to sell lots and pay proceeds on the Nie-
meyer mortgage. It seems from the evidence that Joseph left
the price and terms of such sales altogether in the discretion of
Clem, and Clem continued afterwards to exercise dominion and
control over the property in every respect as if he was the actual
owner thereof, and as if the deed to Joseph Schaer was not in
existence. Meantime, Clem was still carrying on his mercantile
business, but, soon after the execution of the deed to Joseph

Schaer, he says, it commenced to decline. Competition became greater, and sales decreased. His debts increased, while his ability to pay was less. Finally, on the 18th of April, 1896, his creditors continuing to press him, he made an assignment of his stock in trade and other personal property for the benefit of his creditors.

During the course of his business after the execution of the deed to Jos. Schaer, and before said deed was recorded, Clem Schaer contracted the indebtedness to appellant Bunch upon which this action is based. Bunch lived in Little Rock, was a wholesale dealer in grain, and had for several years been selling to Schaer. He knew that Schaer had been the owner of Schaer's Addition, and, in his deposition, states that he had never heard of the conveyance to Joseph until after the assignment; that Clem Schaer always spoke of it as his own property, and that, at the time he sold the goods for which Clem now owes him, he supposed that Clem was still the owner of such property, and gave him credit upon such belief. He also stated that Clem, even after the assignment, promised to have Joseph convey the property to him, saying that he only conveyed it to Joseph "to keep other people from hopping on it."

Clem Schaer denied that he offered to convey this "Addition" to Bunch after the assignment, or that he told him he owned it after the conveyance to Joseph Schaer. But he does not and cannot deny that, after the conveyance to Jos. Schaer, he continued to treat said property as his own. He assessed it as his own, paid taxes on it, rented it and collected rents, and tried to borrow money on it. He advertised it for sale as his own, sold ten of the lots, and he and his wife executed in their own names warranty deeds to the purchasers. He had conversations with a number of different real estate agents and other parties in reference to selling this property, and to none of them did he say anything inconsistent with his ownership thereof or connecting the name of Joseph Schaer with the ownership of such property. None of them knew that the land had been conveyed to Joseph Schaer. Even Niemeyer, whose mortgage Joseph Schaer had agreed to assume as a consideration for the conveyance to him, was not told of such conveyance or agree-

ment.  After such deed was executed, Clem Schaer paid to
Niemeyer several hundred dollars upon his mortgage, proceeds
of the lots sold, but never intimated to him that the mortgage
had been assumed by Jos. Schaer, and that he was making the
payments as his agent.

So far as the evidence discloses, the fact that such prop-
erty had been conveyed to Jos. Schaer was not known outside
of the families of the two Schaers until ten months after its
execution, when, on the very day that Clem Schaer executed his
assignment, it was filed for record.  Under such circumstances
no one can dispute the statement of Bunch that when he sold
his goods to Clem Schaer on credit he believed that Clem owned
the property now claimed by Jos. Schaer, for this was the gen-
eral understanding in the community.  Bunch's statement that
he was influenced by this belief to extend credit to Clem Schaer
is not contradicted.  It is in accordance with the usual custom
of merchants and other business men that in selling on credit
they should be influenced to a considerable extent by the
amount of property the purchaser owns or appears to own.
Clem Schaer was supposed to be the owner of this property,
which was worth, so the evidence shows, from four to ten thou-
sand, and it is reasonable to believe that it helped to sustain
his credit.  We must therefore take it as established that
Bunch, without fault on his part, believed from the conduct of
Clem Schaer in reference to this addition, that he was still the
owner of it, and was thus influenced to sell him the goods, to
recover the price of which this action is brought.

The evidence shows also that Joseph Schaer consented to
and approved of these acts of Clem Schaer.  The facts and
circumstances in proof show that there was an agreement or
understanding between Clem and Joseph Schaer to withhold the
deed to Joseph from record, and to keep the fact of its execu-
tion a secret.  Joseph Schaer, when asked why he did not re-
cord the deed at an earlier date, said that it was not his custom
to record deeds, that he was feeling bad at the time he received
the deed, and so he just handed it to the wife of Clem Schaer
and asked her to keep it for him.  He also stated in his an-
swer that one reason why he did not record the deed was
that he desired to sell the lots and have the proceeds applied on

the Niemeyer mortgage, and that "it was more convenient and less expensive to leave C. R. Schaer in a position to make such deed and papers directly." The statement last mentioned seems more reasonable than the first. It is not customary for a vendee, who intends to retain the title of lands purchased, to hand back to the wife the deed he has received from her husband, and to retain himself no evidence of the title. Nor is it apparent why even a man who "was feeling bad" could not put the deed in his pocket and take it home with him. A deed is not so heavy as to inconvenience even a sick man, and Joseph Schaer does not say he was sick. We think, from these statements in the answer of Joseph Schaer alone, that we would be safe in concluding that he let Mrs. Schaer keep the deed because he had an arrangement to that effect with her husband. A similar admission is found in the answer and testimony of Clem Schaer. But, outside of these admissions, the facts and circumstances in proof make it, as before stated, clear beyond a doubt that there was an understanding between the two Schaers that the deed should not be recorded. The acts and conduct of these two parties in reference thereto cannot be reasonably explained upon any other theory. Though vendor and vendee lived in the same town, the vendee did not take the deed home with him, but at once handed it back to the wife of the vendor, and told her to keep it. The vendor continued, with the knowledge and consent of the vendee, openly and notoriously to exercise acts of ownership and control over the property, and no one outside of their own families was told of the sale until the vendor was about to make an assignment.

These facts and circumstances cannot be disposed of by saying that Clem was only acting as the agent of Joseph. This may be true, but the public was not informed of such agency. Bunch did not know it, and, as Clem had owned this property, and as he continued to control it just as if he were still the owner, it was natural that Bunch should believe him to be the owner. As the conduct of the parties to this deed was directly calculated to impress the public or those having an interest therein with the belief that Clem Schaer was still the owner of such land, we must conclude that they intended such result. It is not necessary to attribute any dishonest motives to them in

reference to this matter. From the time this deed was executed until he assigned, Clem Schaer was struggling to overcome the misfortune which had befallen him in the matter of the official default for which he became liable as a surety. Though his business was falling off, and his debts increasing, he doubtless had hopes that the tide would turn, and he would be able to pull through the period of depression. But both Clem and Joseph knew that, if that conveyance was made public, it would injure the credit of Clem, and at once precipitate the threatened catastrophe. They therefore withheld it from record.

But it is a rule of law, based on the soundest of reasons, that a vendee who, by an agreement or understanding with his vendor, withholds from record and keeps secret his deed of conveyance to valuable property, and allows the vendor to hold himself out as the owner of such property, cannot, if the vendor becomes insolvent, set up his title to such property as against one who has in good faith parted with his goods and credited such vendor in the belief that he still owns such property. As between the vendee and creditor, in such a case, the vendor will still be considered the owner of the property; for to allow the vendee to hold the property under such circumstances would be to permit him and the vendor to perpetrate a gross fraud upon the creditor. Under such circumstances the deed will be treated as fraudulent and void as to the creditor, without regard to whether the parties to the deed intended any fraud or not. *Standard Paper Co.* v. *Guenther*, 67 Wis. 101; *State Savings Bank* v. *Buck*, 123 Mo. 141; *Blennerhassett* v. *Sherman*, 105 U. S. 100; *Hildeburn* v. *Brown*, 17 B. Mon. 779; *Hilliard* v. *Cagle*, 46 Miss. 309; *Francis* v. *Lawrence*, 48 N. J. Eq. 508.

In this case, the conduct of Jos. Schaer in reference to the deed from Clem brings him squarely within the rule of law above stated. He may have intended no wrong; but, by keeping the deed from record and permitting Clem to control the land as his own, he thereby misled Bunch into making a sale to Clem on credit which otherwise he would not have done. We may attribute to the parties to this deed only honest intentions, but still it is, as a matter of law, fraudulent and void as to Bunch.

The chancellor found that Clem Schaer was insolvent, and

the evidence shows that such is the fact, and that, unless Bunch can subject this land to the payment of his judgment, the same will remain unsatisfied. We are therefore of the opinion that the chancellor erred in dismissing the complaint as to Joseph Schaer.

Judgment reversed, and cause remanded with an order that a decree be rendered against Joseph Schaer in accordance with this opinion.