**In re CUSHMAN BAKERY and Cushman Baking Company.**

**Appeal of Jacob AGGER, Trustee.**

**No. 75–1104.**

United States Court of Appeals, First Circuit.

Argued Sept. 10, 1975.

Decided Nov. 25, 1975.
Certiorari Denied April 19, 1976.
See 96 S.Ct. 1670.

Vern Countryman, Cambridge, Mass., with whom Arthur T. Wasserman, Boston, Mass., and Charles W. Smith, Saco, Me., were on brief, for appellant.

William W. Willard, Portland, Me., with whom Alan R. Atkins, Bernstein, Shur, Sawyer & Nelson, Portland, Me., Julius L. Shack, and Slater, Goldman, Gillerman, Shack & Tutun, Boston, Mass., were on brief, for appellees.

Before COFFIN, Chief Judge, McENTEE, Circuit Judge, and THOMSEN *, Senior District Judge.

COFFIN, Chief Judge.

The trustee in bankruptcy for Cushman Baking Company and Cushman Bakery (hereinafter sometimes collectively referred to as "Cushman"), appeals from a final judgment of the District Court for the District of Maine, reversing the order of a bankruptcy judge. The district court held that the bankruptcy judge had erred in (1) declaring invalid a secured claim in the amount of $65,561.51 filed by Bakers Management Corporation (hereinafter referred to as "Bakers") on the ground that the "real and personal property transfers were not properly perfected and in any event were fraudulent" and (2) further disallowing, pursuant to § 57g of the Bankruptcy Act, 11 U.S.C. § 93(g), that claim

and an unsecured claim of $42,756.99 filed by Seaboard Allied Milling Corporation (hereinafter referred to as "Seaboard"), unless voidable preferences totalling $108,940.02 were surrendered.[1]

## I. Factual and Procedural History

Cushman Baking Company and Cushman Bakery were interrelated corporations which operated bakeries in Portland, Maine and Lynn, Massachusetts for many years. Cushman Baking Company operated the Portland plant, and Cushman Bakery operated the Lynn plant until it closed in 1967. For some 30 to 40 years, Seaboard had supplied flour to Cushman on an open account basis, payable 30 days after delivery. In the latter part of 1967, Cushman's account with Seaboard was running substantially in arrears, and it owed Seaboard $31,624.65 on its last five flour shipments.

Following several meetings between officers of Cushman and Seaboard and after Seaboard's officer had examined Cushman's finances, Seaboard, in January, 1968, agreed to lend Cushman $75,-000 for working capital, to be secured by second mortgages on real and personal property located in Portland and by an assignment of a second mortgage on the Lynn plant, which Cushman Baking Company held to secure an inter-company indebtedness of $100,000. Seaboard also agreed to extend $25,000 in credit for flour shipments payable 30 days after delivery.

Although Seaboard was to supply the money for the loan, it was to be granted in the name of Bakers as Seaboard's nominee. Bakers is an affiliated corporation which had customarily acted as Seaboard's nominee in loan transactions. Bakers is controlled by the individuals who control Seaboard and is a "paper

---

* Of the District of Maryland, sitting by designation.

1. Parts I and II of this opinion—the statement of facts and the discussion of the validity of Baker's secured claim—substantially reflect the thoughts and wording of the fine unpublished opinion of the district court. In many instances, we saw no reason to attempt to express its ideas differently and, accordingly, adopted its phraseology. In other instances, we made slight changes in the language and emphasis of the district court in order to answer the arguments appellant pressed on appeal.

corporation" with no assets, income, or profits. As part of the loan transaction, it was also agreed that Cushman would purchase from Seaboard a minimum of 50,000 cwt of flour annually (nearly double the average quantity purchased by Cushman from Seaboard over the last three years), so long as any part of the $75,000 loan remained unpaid. This part of the agreement was incorporated into a Flour Purchase Agreement signed on February 16, 1968. It was contemplated that Seaboard would be secured for future flour shipments by an assignment from Bakers of the mortgages given as security for the $75,000 loan.

On March 4, 1968, before the loan transaction was closed, Seaboard stopped shipments to Cushman because Cushman was too far behind in its payments on account. The loan was closed on March 6, 1968. The documents reflect that on February 12, 1968 Union Mutual Life Company (hereinafter referred to as "Union Mutual"), the holder of the first mortgage on Cushman's Portland realty, consented to Cushman's giving a second mortgage on its Portland real estate. At the closing, Bakers' check for $75,000 was delivered to Cushman, and Cushman delivered its promissory note dated February 16, 1968 for $75,000 to Bakers. This note was secured by three documents: (1) a second mortgage on Cushman's real property in Portland dated February 16, 1968; (2) a second mortgage on Cushman's personal property in Portland dated February 12, 1968; and (3) an assignment of the second mortgage on Cushman's Lynn property. The second mortgage on the Portland real estate was recorded in the Cumberland County, Maine, Registry of Deeds on March 6, 1968. Two financing statements to perfect the second security interest in the Portland personal property were filed, one in the Cumberland County Registry of Deeds and the other in the office of the Secretary of State of Maine, both on March 8, 1968. The real estate mortgage identifies Cushman Baking Company as the mortgagor and Bakers as the mortgagee. The financing statements identify Cushman Baking Company as the debtor and Bakers as the secured party. The assignment of the security instruments from Bakers to Seaboard to secure future flour shipments was never executed, and, because of this failure, Seaboard conceded that its claim for the flour shipped to Cushman after March 6, 1968 is unsecured. Upon receiving Bakers' check for $75,000 at the March 6 closing, Cushman gave Seaboard a check for $73,961.67, representing Cushman's then current indebtedness for flour shipments plus the price of the two February shipments which had been stopped in transit and which were then released by Seaboard.

Subsequent to the loan closing, Seaboard continued to ship Cushman between $25,000 and $30,000 worth of flour monthly. During the four months preceding the filing of Chapter XI proceedings on August 13, 1968, Cushman paid Seaboard $101,941.02 for shipments totalling $144,698.01. As a result, as of the date of the Chapter XI proceedings, Cushman owed Seaboard $42,756.99. During this four month period, Cushman paid three monthly installments due on the $75,000 note, each in the amount of $2,333. Accordingly, as of the date of the Chapter XI proceedings, Cushman owed Bakers $65,561.51 for principal and interest on the note. The bankruptcy court found, and the district court accepted this finding, that Cushman Baking Company and Cushman Bakery were individually and collectively insolvent, within the meaning of § 60(a) of the Bankruptcy Act, 11 U.S.C. § 96(a), at all times during the four month period prior to the initiation of the Chapter XI proceedings on August 13, 1968.

On June 2, 1969, after it became apparent that a plan could not be proposed under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., both Cushman Baking Company and Cushman Bakery were adjudicated bankrupt pursuant to § 376(2) of the Act, 11 U.S.C. § 776(2). Thereafter, on September 29, 1969, Bakers filed a proof of claim and a petition to establish a lien in the amount

of $65,561.51, based upon the $75,000 note and the real and personal property second mortgages given by Cushman Baking Company to Bakers on March 6, 1968. Also on September 29, 1969, Seaboard filed a proof of claim and a petition to establish a lien in the amount of $42,756.99, based upon the February 16, 1968 Flour Purchase Agreement and an assignment from Bakers to Seaboard of the Cushman Baking Company note and second mortgages. As previously indicated, however, Seaboard eventually conceded that its claim was unsecured since the contemplated assignment had not been made.

On November 16, 1970, the trustee in bankruptcy filed formal objections to the establishment of Bakers' and Seaboard's liens, alleging that the security transactions were not properly authorized by Cushman Baking Company's directors and, further, that, as "secret liens", they constituted a fraud on creditors. On August 18, 1971, more than two years after the date on which Cushman was adjudicated bankrupt, the trustee amended his objections to Bakers' secured claim and, for the first time, filed an objection to Seaboard's unsecured claim on the ground that it should be disallowed pursuant to § 57g of the Bankruptcy Act, unless Seaboard surrendered voidable preferences of $101,941.02—the amount Seaboard received as payments on the flour shipments. On September 24, 1971, Seaboard moved to dismiss this objection on the ground that it was barred by the two year statute of limitations of § 11e of the Act, 11 U.S.C. § 29(e). On January 7, 1972, the trustee filed an identical objection to Bakers' claims, asserting that it should be disallowed unless voidable preferences of $6,999—the amount of the three payments Bakers received on the $75,000 note—were surrendered.

After a hearing, the bankruptcy judge held that Bakers' secured claim of $65,-561.51 was invalid because the real and personal property security interests were not properly perfected and, further, were fraudulent transfers under § 67d(2)(d) of the Bankruptcy Act, 11 U.S.C.

§ 107(d)(2)(d). He further held that the trustee's objections to Bakers' claim and to Seaboard's unsecured claim of $42,-756.99 were not barred by the statute of limitations of § 11e, and disallowed both claims pursuant to § 57g unless voidable preferences in the amount of $108,940.02 (the $101,941.02 flour payments plus the $6,999 payment on the $75,000 note) were surrendered.

Bakers and Seaboard appealed the bankruptcy judge's order to the district court and the district court reversed and remanded, holding (1) that Bakers' secured claim of $65,561.51 had been properly perfected under Maine law, (2) that the secured transaction which formed the basis for Bakers' secured claim were not fraudulent under § 67d(2)(d) of the Act, and (3) that the trustee's § 57g objection to the allowance of Seaboard's unsecured claim was barred by the two year statute of limitations of § 11e of the Act. We affirm that portion of the district court decision that held that Bakers' secured claim was properly perfected and not fraudulent under § 67d(2)(d). However, we reverse that portion of the district court's opinion holding that § 11e barred the bankruptcy judge from considering the trustee's objections to the allowance of Seaboard's claim, and we remand for proceedings consistent with this opinion.

II. *The Validity of Bakers' Secured Claim*

*Perfection of Security Interests.* Appellant contends that Bakers' security interests were not properly perfected under Maine law and hence were voidable by the trustee in bankruptcy under § 70(c) of the Bankruptcy Act, 11 U.S.C. § 110(c). Specifically, appellant maintains that the financing statement Bakers filed to perfect its interests were ineffective under Maine law.

Maine's statutory law requires that real and personal property security transactions be recorded in order to be effective against third parties. It is clear that Bakers fully complied with the

express provisions of the relevant recording statutes and disclosed all the information that the Maine statutes governing the recording of security interests in real and personal property explicitly require. To perfect a security interest in realty, Maine law requires only that a properly executed and acknowledged real estate mortgage be recorded in the appropriate registry of deeds and be cross-indexed under the names of the mortgagor and mortgagee. 33 M.R.S.A. §§ 151, 201, 203, and 651. Under the Maine Uniform Commercial Code, a security interest in personalty is perfected if the secured creditor files a financing statement that discloses the names and addresses of the secured party and the debtor, and indicates the type of collateral. 11 M.R.S.A. §§ 9–301, 9–302, 9–401, and 9–402. A properly executed and authenticated real estate mortgage was admittedly filed by Bakers in the Cumberland County Registry of Deeds, disclosing Bakers as the mortgagee and Cushman as the mortgagor; and financing statements that were facially sufficient under the Uniform Commercial Code were filed in the Cumberland County Registry of Deeds and the office of the Secretary of State of Maine, listing Bakers as the secured party and Cushman as the debtor.

Appellant does not dispute Bakers' full compliance with the literal command of the Maine recording statutes. Rather, appellant argues that the financing statements Bakers filed should be deemed ineffective because they failed to disclose Seaboard's interest and, hence, concealed the "true nature" of the transaction. If the financing statement had disclosed Seaboard's interest, appellant maintains it would have given Cushman's other creditors, who presumably were well aware of Cushman's financial situation, notice that possibly the transaction had secured Cushman's antecedent debt to Seaboard. Cushman's other creditors then would have investigated Cushman's financial situation, discovered its insolvency, filed a petition to have Cushman adjudged bankrupt within four months and thereby ensured that the secured transfer would have been a preference within the meaning of § 60a of the Bankruptcy Act, 11 U.S.C. § 96(a).[2] Appellant submits that when a security interest is intentionally perfected in a manner that may result in concealing a preference from unsecured creditors it should be held not to be properly perfected under the Maine recording statutes.[3]

The short answer to appellant's argument is that under Maine's system of notice filing, a financing statement is not intended to enable other creditors to learn the "true nature" of the secured transaction. The provisions of the Maine statutes do not support appellant's premise that the system of notice filing is designed to do more than apprise creditors that the secured party may have a security interest in the collateral described in the financing statement. As the Official Comment to § 9–402(1) of the Code states: "The notice itself indicates merely that the secured party who has filed *may* have a security interest in the *collateral described.* Further inquiry from the parties concerned will be neces-

---

**2.** At oral argument, appellee conceded that the secured transaction would have been a preference under § 60a of the Act if the bankruptcy petition had been filed within four months of the transaction.

**3.** Throughout its brief, appellant characterizes the use of Bakers as Seaboard's nominee as fraudulent. Whether it is fraudulent under § 67d(2)(d) of the Bankruptcy Act will be addressed later in this opinion. In considering appellant's argument under the Uniform Commercial Code, we question whether a secured party's fraudulent intent could vitiate its status

as the holder of a perfected security interest. It is true that 11 M.R.S.A. § 1–203 provides that every duty within this Act imposes an obligation of good faith in its performance, but this section, on its face, has no application to the filing of a financing statement since the Code does not impose a duty to file such statements. Assuming *arguendo* that an absence of good faith will invalidate an otherwise sufficient financing statement, we do not believe that appellant has demonstrated such a lack of good faith here.

sary to disclose the complete state of affairs. Section 9–208 [4] provides a statutory procedure under which the secured party, at the debtor's request, may be required to make disclosure." 11 M.R.S.A. § 9–402, Uniform Commercial Code Comment 2 [emphasis supplied]. The case law makes it abundantly clear that a financing statement is intended merely "to put a searcher on notice that an underlying security agreement may be outstanding. A properly filed financing statement would thus serve its intended purpose if a subsequent party would have been put on notice of an outstanding security agreement." *Bramble Transportation, Inc. v. Sam Senter Sales, Inc.*, 294 A.2d 97, 103 (Del.1971). *See also In re King-Porter Co.*, 446 F.2d 722, 729 (5th Cir. 1971); *Wolf v. Aero Factors Corp.*, 126 F.Supp. 872, 876 (S.D.N.Y. 1954), *aff'd per curiam*, 221 F.2d 291 (2d Cir. 1955); *John Deere Co. v. William C. Pahl Construction Co.*, 59 Misc.2d 872, 300 N.Y.S.2d 701, 703 (1969); *National Cash Register Co. v. Firestone and Co.*, 346 Mass. 255, 191 N.E.2d 471, 474 (1963).

Appellant contends that in cases like the one at bar notice does not provide the debtor with a sufficient opportunity to protect its interest. Appellant notes that § 9–208 only requires disclosure, on request of the debtor, of the amount of the indebtedness and identity of the specific collateral. Because § 9–208 does not require that the secured party disclose information about the nature of the obligation secured, interested parties must rely on voluntary responses to inquiries directed to the debtor or the secured party in order to obtain this information. Appellant's argument proves too much. Rather than support his contention that financing statements that fail to disclose this information should be deemed ineffective, the argument strongly suggests that the sole purpose of the filing system is to provide a mechanism by which other creditors may learn the extent to which specific collateral is encumbered and, hence, that the filing system was not designed to permit other creditors to learn the uses to which the credit had been put or the nature of the obligation secured.[5]

---

4. Section 9–208, 11 M.R.S.A. § 9–208, provides in pertinent parts:

"(1) A debtor may sign a statement indicating what he believes to be the aggregate amount of unpaid indebtedness as of a specified date and may send it to the secured party with a request that the statement be approved or corrected and returned to the debtor . . . . .

(2) The secured party must comply with such a request within 2 weeks after receipt by sending a written correction or approval . . . . . If the secured party without reasonable excuse fails to comply, he is liable for any loss caused to the debtor thereby; and if the debtor has properly included in his request a good faith statement of the obligation or a list of the collateral or both, the secured party may claim a security interest only as shown in the statement against persons misled by his failure to comply. If he no longer has an interest in the obligation or collateral at the time the request is received, he must disclose the name and address of any successor in interest known to him and he is liable for any loss caused to the debtor as a result of failure to disclose."

5. We reject any suggestion that creditors who suspect that a recorded secured transaction is a disguised preference are at the mercy of the debtor or the secured party. If the debtor were to refuse to respond to a creditor's inquiries, it would put the creditor on notice that his interests may have been prejudiced and, quite possibly, would lend considerable support to a trustee's later argument that the transfer was fraudulent within the meaning of § 67d(2)(d) of the Bankruptcy Act. *See* 4 Collier on Bankruptcy ¶ 67.37[3].

Here, we note that no creditor made any inquiries of either Cushman or Bakers, and there is no suggestion by appellant that either party would not have disclosed the nature of the transaction if specific inquiries had been made. It is clear that the burden of inquiry is on the creditor and that the secured party need not, in order to prove perfection of its security interest, demonstrate that it was always willing to disclose the "true nature" of the transaction to inquiring creditors. *See* 11 M.R.S.A. § 9–402, Uniform Commercial Code Comment 2.

■ Although appellant does not argue that the use of a nominee per se invalidated the financing statement, we note that it is clear that the recording of the real estate mortgages and financing statements was entirely proper despite the fact that Bakers, as Seaboard's nominee, rather than Seaboard, as the principal creditor, was named as the mortgagee and secured party. The use of a nominee in real estate transactions, and as mortgagee in a recorded mortgage, has long been sanctioned as a legitimate practice. *Eastern Milling Co. v. Flanagan*, 152 Me. 380, 130 A.2d 925 (1957); *Amherst Factors v. Kochenburger*, 4 N.Y.2d 203, 173 N.Y.S.2d 570, 573 (1958); *Richardson v. Stewart*, 216 Iowa 683, 247 N.W. 273, 274 (1933); *First National Bank of Bridgeport v. National Grain Corp.*, 103 Conn. 657, 131 A. 404, 406 (1925); *Newton Savings Bank v. Howerton*, 163 Iowa 677, 145 N.W. 292, 293 (1914). The use of a nominee is likewise legitimate under the Uniform Commercial Code. As noted in *Industrial Packaging Products Co. v. Fort Pitt Packaging International, Inc.*, 399 Pa. 643, 161 A.2d 19, 21 (1960):

> "The Uniform Commercial Code does not require that the secured party as listed in such statement be a principal creditor and not an agent.  .  .  . The purpose of filing this financing statement is to give notice to potential future creditors of the debtor or purchasers of the collateral. It makes no difference as far as such notice is concerned whether the secured party listed in the filing statement is a principal or an agent, and no provision in

the Uniform Commercial Code draws such a distinction."
*See also In re Fried Furniture Corp.*, 293 F.Supp. 92 (E.D.N.Y.1968).[6]

■ Appellant's argument acquires most of its force from his characterization of the financing statement as "concealing a *preference*". However, it is clear, and appellant does not contend otherwise, that the Bankruptcy Act does not require that the state laws governing the sufficiency of financing statements conform with appellant's position. Whether a security interest has been perfected against the trustee in bankruptcy is exclusively a question of state law. The Bankruptcy Act operates to vest the trustee with the status of a hypothetical lien creditor, 11 U.S.C. § 110(c), but in no way does it purport to require that financing statements disclose certain information. Section 60 of the Bankruptcy Act, which defines voidable preferences, only affects transfers which fall within its express terms. *See* 3 Collier on Bankruptcy ¶ 60.02[1].

Here we are satisfied that Bakers' security interest was properly perfected under Maine state law. Thus, we affirm this portion of the district court's decision.

*Fraudulent Transfers.* As an alternative ground for invalidating Bakers' secured claim, the trustee-appellant argues that the secured transactions were invalid as against him under §§ 70c and 70e of the Bankruptcy Act, 11 U.S.C. §§ 110(c), 110(e), because they were fraudulent under § 67d(2)(d) of the Bankruptcy Act, 11 U.S.C. § 107(d) (2)(d),[7] and the statute of 13 Eliz. c. 5 (1570).[8] Under these statutes, a

---

**6.** That the Uniform Commercial Code does not require disclosure of the name of the real party in interest in a secured transaction is further evident from the Code's treatment of assignments of security interests. Under § 9–405, 11 M.R.S.A. § 9–405, a financing statement need not disclose that an assignment has been made and no filing of an assignment is necessary to continue the perfected status of a security interest.

**7.** Section 67d(2)(d) of the Bankruptcy Act provides:

"Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this [Act] by or against him is fraudulent  .  .  . (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors."

**8.** This statute has been adopted as part of Maine's common law. It declares "utterly void" as against creditors, any conveyance

transfer for fair consideration is fraudulent if the transferor had an actual intent, not an intent presumed in law, "to hinder, delay, or defraud . . . creditors".[9] The bankruptcy judge accepted appellant's argument and held that the transfer was made with the required intent. He stated that it was unnecessary to consider whether Cushman, the transferor had the required intent because Seaboard was in "a unique position to dominate or control the manner in which Cushman's property was disposed." Under such circumstances, the bankruptcy judge concluded, relying upon *Langan v. First Trust and Deposit Co.*, 293 N.Y. 604, 59 N.E.2d 424 (N.Y. 1944) and 4 Collier on Bankruptcy ¶ 67.-37[2],[10] that proof that Seaboard had the requisite intent would be sufficient to establish that the transfers were fraudulent.

The district court, however, held that the application of the *Langan* rule was inappropriate since Seaboard clearly did not have such domination or control over Cushman as to dispense with the necessity of proving that Cushman actually intended to hinder, delay or defraud its creditors. Since there was no evidence of any fraudulent intent on the part of Cushman and since the bankruptcy judge did not find such fraudulent intent, the district court reversed. Although not

necessary to its holding, the district court went on to note that the record provided questionable support for the bankruptcy court's finding that Seaboard had actual intent to hinder, delay or defraud Cushman's creditors. Appellant challenges the district court's holding on those points. First, it contends that the bankruptcy court's application of the *Langan* rule was not reversible error. Second, appellant argues that, even if the *Langan* rule does not apply, the district court erred in concluding that Cushman lacked the intent to delay, hinder, or defraud its creditors. According to appellant, the necessary and obvious consequences of the form in which the transaction was cast, filed, and recorded was to conceal from all other creditors that the transaction effected a preferential transfer to Seaboard and, hence, unlawfully to prejudice Cushman's creditors in the exercise of the rights conferred upon them by the Bankruptcy Act. Since both Seaboard and Cushman must be held to have intended the necessary and obvious consequences of their actions, the court must impute intent to defraud to both of them.[11]

■ We agree that the *Langan* rule has no applicability to this case. In *Langan*, a bank had taken over the total management of the bankrupt's affairs,

---

made with intent to "delay, hinder, or defraud creditors". *Butler v. Moore*, 73 Me. 151, 154–55 (1882). At least as far as the case at bar is concerned, this statute and § 67d(2)(d) of the Bankruptcy Act have the same content.

9. Clauses (a), (b), and (c) of § 67d(2) of the Act render fraudulent transfers made for less than fair consideration. Under these clauses, and under paragraphs (3) and (4) of § 67(d), fraudulent intent is predicated in law because *of the circumstances in which the transfers are made.* Under § 67d(2)(d) of the Act, fraudulent intent is not presumed in law. A transfer for fair consideration can only be made fraudulent upon proof of actual intent to hinder, delay, or defraud creditors. *See* 4 Collier, *supra*, ¶ 67.37[1]. Appellant concedes that Cushman received fair consideration here.

10. Collier states the *Langan* rule as follows:
"Where the transferee or obligee is in a position to dominate or control the bank-

rupt's disposition of his property, however, his intent to hinder, delay, or defraud creditors would seem sufficient to render the transfer or obligation fraudulent within § 67d(2)(d) without respect to the purpose of the bankrupt." 4 Collier, *supra*, ¶ 67.37[2] at p. 533.

11. The intent of Seaboard (and Bakers) is relevant as well. Under § 67d(6) of the Act, 11 U.S.C. § 107(d)(6), even if Cushman intended to defraud its creditors within the meaning of § 67d(2)(d), the transfer will not be invalid against the trustee unless Bakers fails to qualify as a "bona fide purchaser . . . for a present fair equivalent value". Because we hold that Cushman did not act with fraudulent intentions, it is not necessary for us to consider whether Seaboard (and Bakers) qualify as bona fide purchasers for present equivalent value.

and the court held that the bank's proven intent to hinder, delay, or defraud creditors dispensed with the necessity of proving that the bankrupt itself had such an intent when it made the transfer. *Langan* was a case in which the transferee was in a position to dominate or control the bankrupt's disposition of the property. 4 Collier, *supra*, at p. 533. Appellant maintains that there was sufficient evidence to support the bankruptcy judge's determination that there was sufficient domination of Cushman by Seaboard to invoke the *Langan* rule. In support of his contention that the evidence was sufficient, appellant points to the uncontradicted evidence that Cushman was "strapped for cash" prior to taking the security interest, that Seaboard had stopped shipments because of defaults by Cushman in payments immediately before the security agreement was consummated and that the bargain was, on the whole, very favorable to Seaboard. These facts, however, do not establish that Seaboard dominated Cushman's disposition of its property within the meaning of the *Langan* doctrine. The district court was correct in holding that, as a matter of law, Seaboard did not have such domination or control over Cushman as to dispense with the necessity of proving that Cushman had an actual intent to defraud its creditors. The record shows that the loan transaction was the result of extended negotiations between the officers of independently controlled and nonaffiliated corporations, all of whom were knowledgeable and sophisticated businessmen. Cushman, concededly experiencing financial difficulties and presumably without many alternative sources of credit, needed credit and a reliable source of flour. Seaboard desired security for Cushman's outstanding indebtedness and the continuance of Cushman as a customer for its flour. The ultimate arrangement served the business interests of both parties. *See In re Southern Land Title Corp.,* 316 F.Supp. 1059, 1065–66 (E.D.La.1970). The fact that the terms of the agreement were perhaps more favorable to Seaboard than to Cushman does not vitiate its quality as an arm's length transaction.

To establish that the transfers were fraudulent, therefore, it was necessary to demonstrate that Cushman had an actual intent to defraud, hinder or delay its creditors. The district court found that there was no evidence that Cushman actually intended to defraud its creditors. Appellant contests this determination and contends that Cushman's knowing acquiescence in Seaboard's financing arrangement establishes that Cushman intended to conceal the preference Seaboard received and that a transfer accompanied by such an intent is fraudulent within the meaning of § 67d(2)(d) of the Bankruptcy Act.

Here, as in appellant's argument under the Uniform Commercial Code, the argument gains most of its force from the fact that the use of Bakers made it less likely that Cushman's other creditors would discover the preference granted Seaboard in time to ensure that the transfer would be voidable by the trustee in bankruptcy. Again the mere fact that a preference is involved has no special significance. Although every preferential payment to a creditor has the effect of hindering or delaying other creditors from collecting their judgments, it is well established that granting a security interest to secure funds with which the debtor intends to pay a preexisting debt does not necessarily imply an intent to "hinder, delay or defraud creditors" within the meaning of § 67d(2)(d) of the Act. 4 Collier, *supra* at 534. *See Dean v. Davis,* 242 U.S. 438, 444, 37 S.Ct. 130, 61 L.Ed. 419 (1916); *Coder v. Arts,* 213 U.S. 223, 242, 29 S.Ct. 436, 53 L.Ed. 772 (1909). The mortgage may be made in the expectation that, thereby, the debtor will extricate himself from a particular difficulty and be enabled to promote the interests of all other creditors by continuing his business. *See* 4 Collier, *supra,* at 542; *Dean v. Davis, supra,* 242 U.S. at 444, 37 S.Ct. 130.

In recognition of these principles, appellant concedes that he must do

more than establish that Cushman preferred Seaboard or that Cushman failed to disclose Seaboard's interest in the secured transaction. He must show that Cushman's necessary objective in doing so was to prejudice its other creditors' ability to secure the benefits of the Bankruptcy Act. We agree with appellant that his claim may succeed without direct evidence of Cushman's actual intent. It will be enough if appellant demonstrates that Cushman transferred the security interest "under circumstances which forbid any reasonable conclusion other than that the purpose of the transfer was fraudulent as to his creditors." 4 Collier, *supra,* at 537. However, we agree with the district court that there is no evidence that such was the case here.

Appellant argues that the circumstance which transforms this potentially preferential transfer into a fraudulent conveyance is the fact that Cushman acquiesced in the arrangement that the financing statement would fail to disclose Seaboard's interest in the secured transaction. Appellant characterizes the statement as "concealing" Seaboard's interest and notes that secrecy and concealment have long been recognized as "badges of fraud". Under the circumstances, however, Cushman's conduct was entirely consistent with an intent to protect its creditor standing, to continue in business, and to rehabilitate itself financially. Although the financing statement failed to disclose Seaboard's interest, the loan transaction followed the normal business practices of the parties. It is uncontested that Bakers acted as Seaboard's nominee in all transactions in which Seaboard lent money to bakers. Seaboard's purpose in using Bakers as its nominee was so that other bakers would not know that Seaboard was financing one of their competitors and other flour suppliers would not know that Seaboard had loaned money to Cushman, both legitimate business purposes. The long period of negotiation preceding the consummation of the loan and Seaboard's full disclosure of the facts to Union Mutual provide affirmative evidence that

Cushman was primarily interested in promoting its own legitimate business interests. We see no basis for reversing the decision of the district court on this point.

None of the cases appellant relies upon support his assertion that the circumstances in this case forbid any reasonable conclusion other than that Cushman's purpose was fraudulent as to its creditors. The case appellant relies upon most heavily, *Dean v. Davis, supra,* illustrates the kind of transaction that will be held to be fraudulent as to creditors and provides no support for appellant. In *Dean,* the bankrupt, to avert a criminal prosecution, had mortgaged virtually all his assets to secure a note that had matured the day before it was given. The bankrupt's conduct was utterly inconsistent with any intent to rehabilitate himself financially. The bankrupt knew he was insolvent; he must have known that suspension of his business and bankruptcy would result from giving and recording a mortgage of all his property to secure a note that matured before the mortgage was executed. The bankrupt willfully sacrificed his property and his other creditors to avert a threatened criminal prosecution. *Dean v. Davis, supra,* 242 U.S. at 445, 37 S.Ct. 130. Obviously, Cushman's conduct was in no respect comparable. Apart from the fact that Cushman extended Seaboard a preference, its conduct did not necessarily result in sacrificing the interests of Cushman's creditors.

The other major line of cases that appellant relies upon are cases in which the mortgagee-lender, pursuant to an agreement with the mortgagor-debtor, withheld the mortgage from record. *See, e. g., Blennerhassett v. Sherman,* 105 U.S. 100, 26 L.Ed. 1080 (1881); 4 Collier, *supra,* at 538. Appellant maintains that if the transferor's agreement to fail to record a mortgage establishes a fraudulent conveyance, then the concealment implicit in the use of a nominee should also constitute a fraudulent conveyance. The problem with appellant's argument is that it ignores the reason transfers pursuant to an agreement not to record

the mortgage are fraudulent. The reason is not, as appellant asserts, simply that a preference is concealed. Rather, the reason is that the necessary purpose of such agreements is to prevent any further impairment of the mortgagor's credit. *See Blennerhassett v. Sherman, supra,* 105 U.S. at 115, 26 L.Ed. 1080. In the case at bar, the security interest was recorded, so it is clear that Cushman did not intend to conceal the encumbrances on its property and thereby enable it to contract obligations on the basis of its seemingly clear ownership. We note, moreover, that the bankrupt's use of a nominee as mortgagee has been held not to be even a badge of fraud. *See In re Locust Bldg. Co., Inc.,* 299 F. 756 (2d Cir.), *cert. denied,* 265 U.S. 590, 44 S.Ct. 635, 68 L.Ed. 1195 (1924); Collier, *supra,* at 538.

Although, as the district court noted, it may be wiser and more progressive public policy to require full disclosure of potentially preferential secured transactions, neither the Maine UCC nor the Federal Bankruptcy Act can be interpreted as adopting such a policy.[12] Any changes in these laws is a function for legislation. Accordingly, the district court's decision that the secured transactions were properly perfected and not fraudulent is affirmed.

III. *The Applicability of Section 11e to a Trustee's Section 57 Objection to the Allowance of a Claim*

After determining that Bakers' claim of $65,561.51 was unsecured, the

bankruptcy judge, acting pursuant to § 57g of the Act, 11 U.S.C. § 93(g), went on to disallow both that claim and Seaboard's unsecured claim of $42,756.99, unless voidable preferences in the amount of $108,940.02 were surrendered. In so ruling, he held that the trustee's § 57g objections were not barred by the two year statute of limitations prescribed in § 11e of the Act and that the amounts Bakers received on Cushman's $75,000 note during the four month period prior to the filing of Chapter XI proceedings and the payments Cushman made Seaboard for flour shipments during that four month period were voidable preferences. The district court reversed, holding that § 11e's two year statute of limitations operated as a bar to the trustee's objections. Because its ruling on the statute of limitations was dispositive, the district court did not consider whether the payments Seaboard received for flour shipments were voidable preferences. We hold that § 11e's time limitation does not apply to objections to the allowance of a claim unless voidable preferences are first surrendered and that the only time limitations on a trustee's ability to present objections to the allowance of a claim are those flowing from the equitable doctrine of laches. The bankruptcy judge ruled that laches did not bar consideration of the trustee's objections. We remand to the district court to review the bankruptcy judge's determination that laches was not a bar and the determination that the payments made to Seaboard[13] were voidable preferences.[14]

12. A rule requiring the disclosure of potentially preferential secured transactions would present problems of its own. With most preferential transfers there is no possibility of disclosure of the preference to other creditors since there is no public record of the payment of a preexisting debt. Since unsecured potentially preferential transfers would not be affected by such a rule, it may well be questioned whether its limited coverage would be either useful or rationally justified.

13. Since this court has affirmed the district court's holding that Bakers had a valid secured claim, the payments made to Bakers on Cushman's $75,000 note are not voidable prefer-

ences, which could provide the basis for a § 57g objection. 3 Collier, *supra,* ¶ 60.22.

14. Although we remand the question of the applicability of the laches doctrine, we feel constrained to state that, on the basis of the facts that the parties emphasized on appeal, we doubt that the bankruptcy judge erred in holding that the doctrine of laches did not bar consideration of the trustee's objections. We elect to remand this issue because the parties did not brief it and we, therefore, cannot exclude the possibility that the record may contain facts supporting a finding that laches should operate as a bar to the trustee's objection.

We note at the outset that no other federal court of appeals has squarely confronted the question of § 11e's applicability to a trustee's objection to the allowance of a claim.[15] A leading authority on bankruptcy takes the position that objections to the allowance of a claim may be made at any time prior to the allowance of the claim, subject only to the doctrine of laches. 3 Collier, *supra*, at ¶ 57.18[2]. The cases cited in support of this proposition, however, were all decided prior to 1938, the year § 11e was added to the Bankruptcy Act, but there is nothing to suggest that this authority has not considered § 11e's possible applicability and rejected it. In deciding whether § 11e applies to a trustee's § 57 objection to the allowance of a claim, we consider the statutory language itself, the relationship between § 11e and the Act as a whole, and the nature and objectives of § 57's allowance process.

The statutory language can be interpreted to support either the appellant or the appellee. Section 11e provides that a trustee "may, within two years subsequent to the date of adjudication . . . , institute proceedings in behalf of the estate upon any claim against which the period of limitations fixed by Federal or State law had not expired at the time of the filing of the petition in bankruptcy." 11 U.S.C. § 29(e). The most natural interpretation of this language "institute proceedings . . . upon any claim" is that it refers to the institution of a separate action by the trustee which, if the trustee's claim is well-founded, will entitle the trustee to recover on behalf of the estate.[16] A trustee's objection to the allowance of a claim is manifestly not the institution of a proceeding that will entitle the trustee to recover on behalf of the estate.[17] Here, where the objection was not made within two years of the date of adjudication, the trustee's objection would not invest the bankruptcy court with jurisdiction to order that the creditor-claimant pay the amount of the voidable preferences he received over to the estate.

Although this interpretation of "institute proceedings . . . upon any claim" is the most natural one, the statutory language could be construed more expansively to include § 57 objections to the allowance of a claim. The argument is that the trustee is "instituting proceedings" in which the bankruptcy court will adjudicate whether the creditor's claim can be allowed without the surrender of some allegedly voidable preferences. The "claim" of the estate is the estate's asserted right not to pay the creditor anything unless the allegedly voidable preferences are surrendered. Although this second interpretation of "institute proceedings . . . upon any claim" places a slight strain on the statutory language, it is clear that § 11e will bear an interpretation that would render it applicable to objections to the allowance of claims.

To decide whether § 11e should be applicable, we consider the scheme of the Act as a whole and the nature and objectives of § 57's allowance process. The scheme of the Bankruptcy Act seems to us to support appellant's contention that § 11e is inapplicable to an objection to

---

15. In *In re Haupt & Co.*, 390 F.2d 251 (2 Cir. 1969), the parties stipulated that § 11e's two year limitation applied to a trustee's objection to the allowance of a claim. The court, understandably, having no reason to treat the applicability of § 11e as an issue, did not discuss it. We therefore do not look on the case as reasoned authority on this point.

16. Section 11e clearly applies to actions instituted by the trustee to *recover* the amount of voidable preferences that a creditor has received. *Herget v. Central National Bank,* 324 U.S. 4, 65 S.Ct. 505, 89 L.Ed. 656 (1945).

17. We recognize that, if the trustee presents his § 57g objection within two years, the trustee can convert his objection to the allowance of a claim, unless voidable preferences are surrendered, into a proceeding for an affirmative recovery of the amount of the voidable preferences the creditor-claimant received. *Katchen v. Landry,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). *See* Rules of Bankruptcy Procedure 306, 701. Here appellant concedes that § 11e precluded him from affirmatively recovering the amount of the preferences.

the allowance of a creditor's claim under § 57. Under § 11e the statute of limitations begins to run on the "date of adjudication". As regards the allowance process, however, the date of adjudication has no significance whatsoever, and to treat a trustee's objection as barred if not made within two years would in some circumstances be anomalous. Under § 57n, a creditor must file his claims within six months after the first date set for the first creditor's meeting—which § 55, 11 U.S.C. § 91, provides must be held not less than ten nor more than thirty days after the date of adjudication. Thus, it is possible that a creditor might not file his claim until seven months after the date of adjudication. It would, at least, be incongruous to have a two year statute of limitations begin to run before the trustee had any cause to file objections.

More importantly, there are circumstances in which a creditor may file his claim more than two years after the date of adjudication. Section 57n permits creditors, whose claims were not filed within six months of the date of the first creditor's meeting, to file claims against any surplus remaining after all duly filed claims have been allowed and paid in full. To hold § 11e applicable to § 57 objections could absolutely preclude some trustees from objecting to the allowance of a claim against a surplus. Holding § 11e applicable, without more, would be inconsistent with the scheme of the Act. We recognize that it would be possible for courts to avoid these incongruities by utilizing tolling principles or by giving a flexible construction to § 11e's "date of adjudication". But we see no reason to create such a maze, especially since there are affirmative reasons § 11e should not apply to trustee objections to the allowance of a claim. Holding § 11e applicable would be inconsistent with the nature and objectives of the allowance process.

The allowance process historically has been characterized by flexibility and has been free of burdensome technical rules. See 3 Collier, supra, ¶ 57.17[1]. This flexibility has continued to characterize the process through each of the revisions of the Bankruptcy Act. See id. ¶ 57.17, ¶ 57.18. This flexibility is exemplified by § 2a(2) and § 57k, which empower the bankruptcy court, upon petition of the trustee, to reconsider allowed or disallowed claims and allow them or disallow them at any time before the estate has been closed.[18] Although these provisions do not clearly suggest that § 11e is inapplicable to trustee objections to the allowance of a claim, they do suggest that the primary objective of the allowance process is to ensure that the ultimate distribution of the bankrupt estate comports with the requirements of the Bankruptcy Act. Since a strict time limitation upon the filing of objections would be inconsistent with the attainment of that goal, these sections support the conclusion that § 11e should not operate as a bar to the consideration of the trustee's objections to the allowance of a claim.

Although admittedly these provisions provide little direct support for our conclusion, we note that there are no affirmative reasons for holding that § 11e applies to objections to the allowance of a claim. Normally statutes of limitations are designed to avoid the problems associated with the litigation of stale claims and to bring about an end to uncertainty involving potential legal liabili-

---

**18.** See also § 57f of the Bankruptcy Act, 11 U.S.C. § 93(f) which provides that "objections to claims shall be heard and determined as soon as the convenience of the court and the best interests of the estates and the claimants will permit". Although, as the district court noted, § 57f does not create any substantive or procedural rights in the trustee, it does provide some indication that the allowance process was intended to be free of burdensome technical rules governing the timing of the filing of objections. See Collier, supra, ¶ 57.1[1]. Although § 57f was not carried over into the Bankruptcy Rules of 1973, the discretion with regard to the time for determining the objections is unchanged. Id. at 273. Hence, nothing in the new Bankruptcy Rules undermines our reliance upon § 57f.

 

ty. Sections 2a(2) and 57k suggest that during the period before the estate is finally settled, the interest in repose has been subordinated to other values under the scheme of the Bankruptcy Act. The problems associated with the litigation of stale claims will be avoided under our holding that the doctrine of laches applies to a trustee's objection to the allowance of a claim. For example, an unreasonable delay which prejudices the claimant's ability to refute the trustee's objection will constitute laches which will bar consideration of the objections. *See* 3 Collier, *supra,* at 291. The doctrine of laches will promote the positive values of a statute of limitations without unduly impairing the attainment of the primary objective of the allowance process: correct distribution of the bankrupt estate.

It should be apparent that it will generally be to the trustee's disadvantage to wait more than two years after the date of adjudication to object that a claim should not be allowed unless voidable preferences are surrendered. If the objection is made within two years, the trustee can affirmatively recover the full amount of the voidable preference. *See Katchen v. Landry,* 382 U.S. 323, 65 S.Ct. 505, 89 L.Ed. 656 (1966); Rules of Bankruptcy Procedure 306, 701.[19] If the objection is not made within the two year period, the bankruptcy court's disallowance of the claim will rarely leave the estate in as good a position as it would have been in if the estate had recovered the amount of the voidable preference. Even in those cases where the creditor's claims are in excess of the amount of the voidable preferences, it is not likely that the creditor's distributive share, which the estate would not have to pay out if the objection were successful, would be greater than the amount of the voidable preference. Thus, our decision will, in no way, encourage trustees to wait two years before presenting their objections.

In those cases in which the trustee fails to present his claim within the two year period, however, the purposes of § 57g and the scheme of the Act require that, subject only to the doctrine of laches, the bankruptcy court should rule on the merits of the trustee's objections.

We reverse the portion of the district court decision dealing with Seaboard's unsecured claim and remand for consideration of the timeliness of appellant's objection under the laches doctrine and, if necessary, of the correctness of the bankruptcy court's ruling that Seaboard received voidable preferences. In all other respects, the decision of the district court is affirmed.

*Affirmed in part, and reversed and remanded in part.*

**19.** Even if the recipient of the voidable preference has not filed a claim, the trustee may institute an independent action in federal court to recover the amount of the preference. *See*

*Herget v. Central Nat'l Bank & Trust Co., supra.*